## E.N.O. *vs.* L.M.M.

Suffolk. March 4, 1999. - June 29, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, MARSHALL, & IRELAND, JJ.

*Supreme Judicial Court,* Superintendence of inferior courts. *Jurisdiction,* Probate Court. *Probate Court,* Jurisdiction. *Minor,* Visitation rights. *Parent and Child,* Interference with parental rights, Equitable parent doctrine. *Words,* "De facto parent," "Nontraditional family."

A judge of the Probate Court properly exercised equity jurisdiction to order visitation, pending resolution of the proceedings, between a child and the child's de facto parent, one of two women coparents in a nontraditional family relationship, who was seeking to adopt the child and share legal custody pursuant to a coparenting agreement, and the judge properly applied the best interests of the child standard to the particular circumstances. [826-834] FRIED, J., dissenting, with whom LYNCH, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 24, 1998.

The case was heard by *Greaney,* J.

*Elaine M. Epstein & Gary Owen Todd* (*Rosemarie Haigazian* with them) for the defendant.

*E. Oliver Fowlkes & Mary L. Bonauto* (*Honora Kaplan* with them) for the plaintiff.

*Bettina Borders* (*Dana Alan Curhan* with her) for the child.

*Gretchen Van Ness & Pauline Quirion,* for Greater Boston Legal Services & others, amici curiae, submitted a brief.

ABRAMS, J. A single justice of the Appeals Court allowed the defendant's, L.M.M.'s, petition pursuant to G. L. c. 231, § 118, to vacate a temporary visitation order issued by the Probate Court, reasoning that *C.M.* v. *P.R.,* 420 Mass. 220 (1995), controlled. The plaintiff, E.N.O., petitioned a single justice of this court, pursuant to G. L. c. 211, § 3, to reinstate visitation pending a trial on the merits. Distinguishing the *C.M.* case, the single justice allowed the request. The defendant then filed this appeal. We affirm.

The issue, one of first impression, is whether the facts war-

rant the Probate Court's exercise of jurisdiction to grant visitation between a child and the child's "de facto" parent.[1] Because visitation was in the best interests of the child, we hold that the single justice did not abuse his discretion in reinstating visitation.

The facts are as follows. The parties are two women who shared a committed, monogamous relationship for thirteen years. During their relationship, they availed themselves of every legal mechanism for signifying themselves life partners. From the beginning of their relationship, the plaintiff and the defendant planned to become parents. In 1991, they elected to do so biologically, deciding that the defendant should try to become pregnant through artificial insemination. Before the insemination process began, the defendant and the plaintiff both attended workshops to learn about artificial insemination and parenting issues. The plaintiff attended all the insemination sessions and participated in all medical decisions.

In 1994, while the couple was living in Maryland, the defendant became pregnant. Throughout the defendant's complicated pregnancy, the plaintiff cared for her. The plaintiff also accompanied the defendant on every visit with her doctors. When the child was born in February, 1995, the plaintiff acted as the defendant's birthing coach and cut the child's umbilical cord. The plaintiff stayed overnight at the hospital. Hospital staff treated her as a mother, giving her a bracelet denoting her a parent of "Baby O.M." The parties sent out birth announcements naming them both as parents. The child's last name consists of the parties' last names.

Before the child was born, and again afterward, the parties executed a coparenting agreement in which they expressly stated their intent to coparent a child. The agreement also expressed the parties' intent that the plaintiff retain her parental status even if the defendant and the plaintiff were to separate. The defendant executed documents authorizing the plaintiff to care for the child as a parent.[2]

---

[1] The defendant asks us also to address whether the plaintiff may seek adoption or custody of the child and whether a coparenting agreement executed by the parties is specifically enforceable. The only issue before the single justice was the propriety of the temporary visitation order. The plaintiff's custody, adoption, and financial claims are still pending in the Probate Court. We do not reach these issues.

[2] These documents included "Medical and Health Care Authorization,"

After the child was born, the plaintiff assumed most of the financial responsibility for the family. Later, for a period of approximately seven months, the plaintiff also assumed primary care for the child because the defendant was experiencing medical problems. The child calls the plaintiff "Mommy" and the defendant "Mama." He tells people that he has two mothers.

In September, 1997, the parties moved to Massachusetts. In April, 1998, the plaintiff called an attorney about proceeding with joint adoption of the child. Thereafter the parties' relationship began to deteriorate. The couple separated in May, 1998. The defendant then denied the plaintiff any access to the child.

In June, 1998, the plaintiff filed a complaint seeking specific performance of the parties' agreement to allow the plaintiff to adopt the child and assume joint custody. She also sought visitation with the child as well as a winding down of her financial affairs with the defendant. The defendant's motion to dismiss the action was denied.

After a hearing, a Probate Court judge ordered temporary visitation, pending trial, between the plaintiff and the child. The judge applied the "best interests of the child" standard, noting that "children born to parents who are not married to each other are to be treated in the same manner as all other children." See G. L. c. 209C, § 1. The judge viewed several facts as significant. He found that the decision to have the child was made jointly by the plaintiff and the defendant. After the child's birth, the plaintiff had daily contact with the child and "acted in the capacity [of] his other parent in all aspects of his life." The judge further observed that the plaintiff and the defendant "at all times referred to each other as [the child's] parents." In addition, the judge stated, without further description, that the plaintiff was "listed on all contracts and applications as [the child's] parent."

The judge also relied on the report of the guardian ad litem (GAL). The judge specifically cited the GAL's finding that the plaintiff was an active parent and appreciative of the child's needs. The GAL stated that "both mothers were clearly involved in [the child's] upbringing." From all these facts, the judge concluded that temporary visitation was in the child's best interests.

1. *Standard of review.* General Laws c. 211, § 3, confers on

"Designation [of the plaintiff as] Standby Guardian," and "Nomination of Guardian of the Person and Property of my Child."

this court the power of "general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided." "We shall reverse a decision of a single justice only when there is clear error of law or an abuse of discretion." *Department of Mental Retardation* v. *Kendrew*, 418 Mass. 50, 53 (1994). We conclude that the single justice was correct in his determination that, on these facts, the Probate Court judge properly exercised his jurisdiction.

2. *Discussion.* The heart of the defendant's argument is that the Probate Court lacked jurisdiction to order temporary visitation. The defendant looks first for statutory authority and finds no statute expressly permitting the order of visitation privileges to one who stands in a parent-like position. However, the Legislature has conferred equity jurisdiction on the Probate Court, and that is the source of the Probate Court's authority in this matter.[3] General Laws c. 215, § 6, provides: "The probate and family court department shall have original and concurrent jurisdiction with the supreme judicial court and the superior court department of all cases and matters of equity cognizable under the general principles of equity jurisprudence and, with reference thereto, shall be courts of general equity jurisdiction . . . ."

The Probate Court's equity jurisdiction is broad, extending to the right to authorize visitation with a child. This is because the Probate Court's equity jurisdiction encompasses "the persons and estates of infants." See *Gardner* v. *Rothman*, 370 Mass. 79, 80 (1976) (Probate Court has jurisdiction over claim of father of illegitimate child to visitation because the court's equity jurisdiction "extends to the persons and estates of infants, and is not restricted to legitimate children"). The court's duty as pa-

---

[3]The defendant is correct that other statutes conferring jurisdiction do not provide the Probate Court with authority in this matter. For example, when a child's married parents separate or divorce, G. L. c. 208, §§ 19 and 28, authorize the Probate Court to make orders regarding visitation while the divorce is pending and after it becomes final. Here, the child's parents, the plaintiff and the defendant, were not married nor could they be under Massachusetts law. Similarly, statutes governing paternity do not confer jurisdiction over actions like that before us. General Laws c. 209C, §§ 5 and 10, require an adjudication of paternity before the Probate Court is authorized to award visitation. The Legislature has authorized the Probate Court to grant visitation rights to grandparents of unmarried minor children, G. L. c. 119, § 39D, but there is no parallel provision authorizing similar measures in actions pressed by parents in the plaintiff's position.

rens patriae necessitates that its equitable powers extend to protecting the best interests of children in actions before the court, even if the Legislature has not determined what the best interests require in a particular situation.[4] "In every case in which a court order has the effect of disrupting a relationship between a child and a parent, the question surely will arise whether it is in the *child's* best interest to maintain contact with that adult." *Youmans* v. *Ramos, ante* 774, 783 (1999).[5] See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702, 703 (1984) (postadoption visitation by child's mother was properly evaluated by examining child's best interests); *Koelle* v. *Zwirin*, 284 Ill. App. 3d 778, 784 (1996) (best interests test controls claim of visitation by biological stranger to child); *Roberts* v. *Ward*, 126 N.H. 388, 392 (1985) (court may use its parens patriae power to decide whether welfare of child warrants court-ordered visitation with grandparents); *Zack* v. *Fiebert*, 235 N.J. Super. 424, 432 (1989) (same). But see *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 323 n.11 (1995) (limiting Probate Court's equity jurisprudence to cases in which the subject matter of the controversy is one recognized by the courts at common law). A judge, therefore, should evaluate a child's best interests in light of the specific circumstances.

We acknowledge that the "best interests" standard is somewhat amorphous. We must ask what facts the judge may

---

[4]We note that G. L. c. 119, § 39D, granting visitation rights to grandparents, does not limit the scope of equity jurisdiction of the Probate Court. It does not preclude in all other circumstances an order of visitation between a child and one who is not a legal parent. See *Youmans* v. *Ramos, ante* 774, 783 n.18 (1999).

[5]The dissent attempts to distinguish this case from *Youmans* by claiming that the defendant and the child were never subject to the Probate Court's jurisdiction in some other proceeding or for some other reason. The dissent ignores the fact that the plaintiff seeks to adopt the child and share legal custody because, in the dissent's view, these claims are baseless. Even without these additional claims, however, it is our opinion that the broad jurisdiction of the Probate Court gives it authority in this matter.

The dissent also implies that, unlike the plaintiff here, the aunt in *Youmans* was a de facto parent because she was a legally adjudicated guardian. However, the aunt was appointed temporary guardian only eleven days before the father moved for custody. We concluded that the aunt was a de facto parent not because she held temporary guardianship, but because she attended to the child's developmental, medical, and educational needs for the five years from the child's infancy to her appointment as temporary guardian. See *Youmans, supra* at 776.

take into account in determining where a child's best interests lie. Here, the judge emphasized the plaintiff's role as a parent of the child. It is our opinion that he was correct to consider the child's nontraditional family.

A child may be a member of a nontraditional family in which he is parented by a legal parent and a de facto parent. A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent. See *Youmans, supra* at 776 & n.3 (1999); ALI Principles of the Law of Family Dissolution § 2.03(1)(b) (Tent. Draft No. 3 Part 1 1998) (adopted at annual meeting May, 1998). The de facto parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide.[6] See ALI Principles of the Law of Family Dissolution, *supra* at § 2.03(6).

The recognition of de facto parents is in accord with notions of the modern family. An increasing number of same gender couples, like the plaintiff and the defendant, are deciding to have children. It is to be expected that children of nontraditional families, like other children, form parent relationships with both parents, whether those parents are legal or de facto. See *Adoption of Tammy*, 416 Mass. 205, 207 (1993). See also J. Goldstein, The Best Interests of the Child 12-13 (1996). Thus, the best interests calculus must include an examination of the child's relationship with both his legal and de facto parent.

In assessing a child's relationship with his de facto parent, a judge may consider the factors we have set forth previously. For example, in *C.C.* v. *A.B.*, 406 Mass. 679 (1990), we held that a man could maintain a paternity action under G. L. c. 215, § 6, even though the mother of the child was, at the time of conception and birth, married to another man. *Id.* at 680. We reasoned

---

[6]The de facto parent fulfils this role "for reasons primarily other than financial compensation." See ALI Principles of the Law of Family Dissolution § 2.03(1)(b) (Tent. Draft No. 3 Part 1 1998) (adopted at annual meeting May, 1998). Thus, we do not recognize as a de facto parent a babysitter or other paid caretaker. Even though these caretakers may grow to feel genuine affection for their charges, their caretaking arrangements arose for financial reasons. See *id.* at comment (b)(ii), at 42.

that the man demonstrated a substantial parent-child relationship. *Id.* at 689. He was listed on the child's birth certificate and baptismal record. The child bore the plaintiff's last name. The mother admitted that the plaintiff might be the father of the child. After the child was born, the plaintiff, the mother, and the child lived together as a family. Finally, the plaintiff demonstrated his interest in continuing his relationship with the child. *Id.*

We reached the opposite result in *C.M.* v. *P.R.*, 420 Mass. 220 (1995). In that case, a man who was not the biological father of a child sought an adjudication of paternity, as well as incidental visitation rights, under the equitable parent doctrine.[7] *Id.* at 220, 223. We held that the plaintiff did not assert a ground on which relief could be granted because "[h]is devotion to the child does not, without more, permit an adjudication of paternity or visitation privileges." *Id.* at 223. Although the plaintiff had been living with the mother for several months prior to the birth of the child, he had not been part of the decision to create a family by bringing the child into the world. *Id.* at 220-221. Unlike C.M., the plaintiff before us was intimately involved in the decision to bring the child into the world. C.M. also sought an adjudication of legal paternity, not visitation rights as a de facto parent. We did not address the de facto parent doctrine in *C.M.*

We conclude that the single justice did not err or abuse his discretion in reinstating the order of temporary visitation. The Probate Court judge determined that visitation between the plaintiff and the child would be in the child's best interests, and that finding is amply supported. The plaintiff is the child's de facto parent.[8] The plaintiff has participated in the child's life as a member of the child's family. They attended workshops and doctor's visits together. The plaintiff participated in the birth as a father would. The plaintiff was listed on the birth announcements, and the child's last name consists partly of the plaintiff's last name. Here, for example, the plaintiff and the defendant decided to have a child and to form a family. The plaintiff and

---

[7]The equitable parent doctrine provides that the husband of the biological mother of a child born or conceived during marriage, who is not the biological father of the child, may be treated as the father if a parental relationship is acknowledged by the father and child or is developed in cooperation with the mother. See *C.M.* v. *P.R.*, 420 Mass. 220, 223-24 (1995).

[8]The parties acknowledged that the plaintiff is the child's de facto parent in the coparenting agreement they executed after the child's birth.

the defendant manifested their level of commitment to each other, to the child, and to their new family by executing and re-executing the coparenting agreement.[9] In the coparenting agreement, the parties revealed their beliefs regarding the child's best interests, stating their wish that the child continue his relationship with the plaintiff in the event that the parties' relationship ended. See *Wilcox* v. *Trautz*, 427 Mass. 326, 334 n.7 (1998) (cohabitating couple can contract regarding the rights of their children so long as the judge determines that the terms reflect the child's best interests). After the child's birth, the plaintiff resided with the child and the defendant as a family. With the defendant's consent, the plaintiff participated in raising the child, acting in all respects as a de facto parent. The GAL found that the plaintiff was an active parent, responsive to the child's needs. The plaintiff also supported the family financially, and, while the defendant was ill, assumed primary care for the child. The defendant encouraged the plaintiff's parental role, representing the plaintiff as the child's parent in her public dealings and expressing her desire that the plaintiff care for the child as a parent.[10] The defendant authorized the plaintiff to make medical decisions for the child and designated the plaintiff as the child's

[9]The defendant contends that the existence of the coparenting agreement is inapposite because it is not enforceable under Maryland or Massachusetts law. The agreement is enforceable at least with respect to property, financial, and other matters relevant to the parties' relationship, but not as to the child's best interests. See *Wilcox* v. *Trautz*, 427 Mass. 326, 334 & n.7 (1998).

[10]The dissent misperceives our reasoning as relying on rights arising from the agreement. Our focus is the best interests of the child, which encompass the child's relationship with a de facto parent. We view the agreement as indicative of the defendant's consent to and encouragement of the plaintiff's de facto parental relationship with the child. The agreement also confirmed that the plaintiff did not assume caretaking responsibilities in exchange for financial remuneration. And, finally, the agreement revealed the parties' belief as to the child's best interests. The judge therefore could consider the agreement to determine visitation, as well as to resolve the financial and property issues.

The dissent further argues, relying on the ALI draft, that the fact that the plaintiff did not adopt the child is " 'some evidence' that [the plaintiff's] relationship with the child does not rise to the level of de facto parenthood." *Post* at 839. In fact, the ALI draft states that failure to adopt is "some evidence, although not dispositive, that the legal parent did not consent to the formation of the de facto parent relationship." See ALI Principles of the Law of Family Dissolution, *supra* at § 2.03 comment (b), at 41. The agreements executed by the defendant tend to establish her consent to the plaintiff's de

guardian in the event of the defendant's death or incapacitation. The child's attachment to the plaintiff as a de facto parent is evidenced by his calling her "Mommy" and telling people he has two mothers. Thus, on these facts, the best interests of the child require that the plaintiff, as the child's de facto parent, be allowed temporary visitation with the child.[11]

We disagree with the defendant's assertion that this result restricts her fundamental right, as a fit parent, to the custody of her child. A parent's liberty interest in her relationship with her child is grounded in art. 10 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution. *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972); *Opinion of the Justices*, 427 Mass. 1201, 1203 (1998). Parental rights, however, are not absolute. *Opinion of the Justices, supra.*

facto parental role.

The dissent infers from our attention to the coparenting agreement a conclusion that such agreements, when executed by same-sex couples, "stand[] on a special footing." *Post* at 841. According to the dissent, our decision "is a clear step in granting legal force to [same-sex] unions." *Id.* We do not agree. The coparenting agreement stands on the same footing as the agreement in *Wilcox, supra,* where we held that a cohabitating couple could enter into a contract regarding financial, property, and other matters relevant to their relationship. See *id.* at 334. Here, unlike *Wilcox,* a child is involved. For the terms of the agreement dealing with the child, the child's best interests is the critical issue. See *id.* at 334 n.7. The judge was therefore correct to apply the best interests of the child standard. By treating same-sex couples differently, it is the dissent that is trying to put the contract on special footing.

[11]This result is in accord with other jurisdictions. See, e.g., *J.A.L.* v. *E.P.H.,* 453 Pa. Super. 78, 92 (1996) (mother's former same-sex partner could pursue visitation because she stood in loco parentis to child); *Holtzman* v. *Knott,* 193 Wis. 2d 649, 694, cert. denied, 516 U.S. 975 (1995) (same-sex partner can seek visitation when she has parent-like relationship with child and significant triggering event justifies State intervention in child's relationship with biological or adoptive parent); *A.C.* v. *C.B.,* 113 N.M. 581, 586 (1992) (standing based on deprivation of right to maintain continuing relationship with child). Jurisdictions that have reached the opposite result differ from ours because their statutory law supplants the equitable powers of their courts. See, e.g., *West* v. *Superior Court,* 59 Cal. App. 4th 302, 309 (1997) (court lacked jurisdiction to enter order granting visitation rights to former partner because statutory law occupies field of child visitation); *Music* v. *Rachford,* 654 So. 2d 1234 (Fla. Dist. Ct. App. 1995) (per curiam) (visitation rights with regard to nonparent solely statutory); *Alison D.* v. *Virginia M.,* 77 N.Y.2d 651, 656 (1991) (same-sex partner not parent within meaning of domestic relations statute). But see *Lynda A.H.* v. *Diane T.O.,* 243 A.D.2d 24, 27 (N.Y. 1998) (same-sex partner denied visitation because it impermissibly impaired biological mother's right to custody and control of child).

Indeed, postadoption visitation by members of an adoptee's natural family is constitutionally permissible, *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra*, as is visitation by grandparents. G. L. c. 119, § 39D. We must balance the defendant's interest in protecting her custody of her child with the child's interest in maintaining her relationship with the child's de facto parent.[12] See *M.J.C. v. D.J.*, 410 Mass. 389, 393 (1991); *C.C. v. A.B., supra* at 691. The intrusion on the defendant's interest is minimal. What tips the scale is the child's best interests. "The first and paramount duty of courts is to consult the welfare of the child." *Youmans, supra* at 782, quoting *Richards v. Forrest*, 278 Mass. 547, 553 (1932).

Moreover, this case differs from cases in which a putative father's paternity suit disrupts an existing family unit. The family that must be accorded respect in this case is the family formed by the plaintiff, the defendant, and the child. The defendant's parental rights do not extend to the extinguishment of the child's relationship with the plaintiff. See *Opinion of the Justices, supra* (overriding principle in determining right of parent to custody must be best interests of child); *Richards v. Forrest, supra* ("Parents are the natural guardians of their minor child and entitled to its custody. But they have no absolute property right of which they can in no way be deprived without their consent. Their right will not be enforced to the detriment of the child"). The child's interest in maintaining his filial ties with the plaintiff counters the defendant's custodial interest. See *Opinion of the Justices, supra* at 1206; *Adoption of Tammy*, 416 Mass. 205, 214-215 (1993) ("As the case law and commentary on the subject illustrate, when the functional parents of children born [to a mother and her same-sex partner] separate or one dies, the children often remain in legal limbo for years while their future is disputed in the courts. . . . In some cases, children have been denied the affection of a functional parent who has been with them since birth, even when it is apparent that this outcome is contrary to the children's best interests"). The only family the child has ever known has splintered. The child "is entitled to be protected from the trauma caused by the

---

[12]On this point we take a different view from the dissent. The dissent stresses the interference with the defendant's control over the child's upbringing while discounting the child's interest in maintaining a relationship with his other parent.

disruption" of his relationship with the plaintiff.[13] *Youmans, supra* at 784.

We conclude that, on these facts, the Probate Court properly allowed the plaintiff's motion for temporary visitation with the child. We affirm the order of the single justice reinstating the Probate Court judge's order for temporary visitation.

*So ordered.*

FRIED, J. (dissenting, with whom Lynch, J., joins). At the insistence of a plaintiff related neither by blood nor marriage to either the minor child or the child's biological mother, a probate judge has ordered the mother to allow the plaintiff rather extensive visitation rights with the child. There has been no allegation, much less any finding, that the mother has failed in any recognized legal duty to the child. Nor was the mother or child ever subject to the jurisdiction of the Probate Court in some other proceeding or for some other reason. This mother is, in every way relevant to the law, like any other mother properly caring for her child. And yet at the instance of a person who is legally a stranger to the mother-child relationship, a Probate Court has entered an order significantly interfering with the mother's control over her child's upbringing.

The probate judge's order in this case was wholly without warrant in statute, precedent, or any known legal principle, and yet the majority of this court has upheld it. As such, the opinion the court delivers today is a remarkable example of judicial lawmaking. It greatly expands the courts' equity jurisdiction with respect to the welfare of children and adopts the hitherto unrecognized principle of de facto parenthood as a sole basis

---

[13]The defendant further argues that the Probate Court judge erred by failing to hold a full evidentiary hearing before ordering temporary visitation. She asserts that she should have had the opportunity to cross-examine the GAL and to present the testimony of family members and the child's counsellor. We disagree. The judge properly solicited a preliminary report of the GAL and gave both parties an opportunity to be heard on the report and the motion for visitation. The visitation order is temporary and may be altered or even vacated on a trial on the merits. The case cited by the defendant, *Gilmore* v. *Gilmore*, 369 Mass. 598 (1976), is distinguishable because the error in that case was the refusal of the judge to permit the guardian ad litem to testify at a trial on the merits in a divorce case. *Id.* at 604. The action before us has not proceeded to trial and thus is not subject to the same procedural requirements.

for ordering visitation. Even while expanding judicial authority and making an addition to the common law, the court speaks as though its decision were nothing extraordinary. In light of the denigration of parental rights and the judicial infringement on the province of the Legislature effected by the court's decision, all without an acknowledgment of the novelty of that decision, I must respectfully dissent.

## I

The court's purported basis of jurisdiction in this case is G. L. c. 215, § 6, under which the Probate Court has "original and concurrent jurisdiction with the supreme judicial court and the superior court department of all cases and matters of equity cognizable under the general principles of equity jurisprudence." The equity jurisdiction of the Probate Court, including jurisdiction over the welfare of children, is wide indeed, but at least two principles constrain the court's authority to intervene in family relations. The first is the concept that general equity principles permit courts to award relief only where the plaintiff has stated a legally recognizable claim on which relief can be granted. In *C.M.* v. *P.R.*, 420 Mass. 220 (1995), for example, a man other than the child's biological father sought to have the court establish his paternity under the equitable powers granted by § 6. The court acknowledged that the statute itself did not limit the scope of equity jurisdiction, but rejected the plaintiff's claim because he had not alleged biological paternity and therefore "did not assert a ground on which relief could be granted." *Id.* at 223. See *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 323 n.11 (1995), quoting R.W. Bishop, Prima Facie Case, Proof and Defense § 1262 (3d ed. 1987) (refusing to grant visitation to grandparents under general equity principles because "matters of equity jurisprudence include 'cases in which the subject matter of the controversy is one recognized by the courts at common law, but in which the remedy at law is not plain, adequate and complete' " and because "[t]here is no common law right to grandparent visitation"). As in *C.M.* v. *P.R.*, *supra*, the plaintiff here has stated no theory recognized under current Massachusetts law that justified the court in awarding visitation rights.[1]

The second, closely related, principle that should have

---

[1]The court observes that in *C.M.* v. *P.R.*, 420 Mass. 220 (1995), we did not address the de facto parent doctrine. Indeed we did not, as the term was unknown to the jurisprudence of this court and only makes its entrance today.

constrained the court from reaching the decision it did is that it has never been supposed that a probate judge may simply drop into a family relation without any particular legal warrant and decree that a parent must follow a particular course in the upbringing of that child, when that course is not otherwise prescribed by law or its contrary forbidden by law. The courts, if there is not an adoption proceeding or some other proceeding regarding the custody of a child, do not have a free-ranging mandate to act in loco parentis in the absence of an allegation of unfitness, abuse, or deprivation of necessities. See, e.g., *Care & Protection of Robert*, 408 Mass. 52 (1990); *Custody of a Minor*, 389 Mass. 755 (1983); *Custody of a Minor*, 375 Mass. 733 (1978).

The court's reliance on *Youmans* v. *Ramos, ante* 774 (1999), as support for its acceptance of jurisdiction here is unconvincing. The court in *Youmans* specifically stated that the "right (or standing) of [a nonparent] to seek visitation privileges with a minor child is not at issue in this case." *Id.* at 780. Moreover, the court ignores the fact that in *Youmans*, the court already had jurisdiction over the child's welfare for the legitimate purpose of transferring custody of the child from a third person back to her natural father. *Youmans* does not provide support for the court's decision in this case to intervene in the child's upbringing and declare what is in the child's best interests without any legal predicate for doing so.[2] And the court's invocation of the discussion in *Youmans* of a "parent-like relationship" is inapposite. Unlike *Youmans*, where the person to whom visitation was granted had previously had legal custody of the child and therefore had stood as a legally adjudicated guardian, in a parent-like relationship to the child, the plaintiff here has never had formal custody of the child and stands in a parent-like relationship with the child only in the novel sense announced here and not previously recognized by the law of the Commonwealth.[3]

---

[2]The fact that the petitioner here is now seeking to share custody of the child and to adopt the child does not, as the court suggests, provide a predicate for awarding visitation, because those other claims are baseless. There is no basis for awarding custody for the reasons discussed here, and there is no basis for an adoption order without the consent of the child's living parent unless the standard set out in G. L. c. 210, § 3, for dispensing with consent to adoption has been met.

[3]The court's citation to *Petition of the Dep't of Social Servs. to Dispense*

## II

In determining that the plaintiff should be granted temporary visitation with the child, the court oscillates between two rationales, as it must. The opinion claims to rest on the best interests of the child, so as to avoid the criticism that it is enforcing a contract between the parties. But in order to ward off the equal and opposite criticism that the court is granting an open-ended authority to interfere with a fit parent's otherwise lawful control of her young child, the court must emphasize the special circumstances of the parties' arrangements and agreements even though those have no bearing on determining the child's best interests but only on the expectations of the mother's former partner. The court oscillates, but it does not come to rest.

The court's attempt to distinguish its recent decision in *C.M.* v. *P.R.*, *supra*, illustrates its focus on the relationship between the petitioner and the mother. The facts of *C.M.* are very similar to the facts in this case except that the person seeking visitation rights was a man who had lived with the child's mother. Like the plaintiff here, the man was neither the biological parent of the child nor married to the parent, nor did he have a legal obligation to support the child. But the plaintiff attended child birth classes with the mother, chose the child's name with the mother, lived with the mother and child for the first three years of the child's life, and served at times as the child's primary caretaker, and his name appeared on the child's birth certificate as the child's father. See *id.* at 221. We concluded that his "devotion to the child does not, without more, permit an adjudication of paternity *or visitation privileges*" (emphasis supplied). *Id.* at 223. In distinguishing *C.M.*, the court relies in part on a factor irrelevant to the best interests of the child — that, "[a]lthough the plaintiff [in *C.M.*] had been living with the mother for several months prior to the birth of the child, he had not been part of the decision to create a family by bringing the child into the world." *Ante* at 830. The court ignores the three-year period during which the plaintiff in *C.M.* had lived with the child and its mother "as a family" after the child's birth, *id.*

*with Consent to Adoption*, 392 Mass. 696, 702, 703 (1984), is similarly inapposite. There, the court dispensed with the mother's consent to her child's adoption by someone else due to the mother's unfitness and simultaneously granted postadoption visitation to the mother. Thus, unlike the instant case, the person granted visitation in that case was not only parent-like, but was actually the child's biological mother.

at 221, yet surely events occurring during the child's life are more relevant to the child's well-being than decisions or arrangements concluded between the mother and her partner before the child's birth. By giving such weight to this factor, the court makes evident that it is not the child's interest that motivates this decision, but a desire to acknowledge and give status to the arrangements made between the plaintiff and the mother before the child was even conceived.

### III

The court today adopts a "de facto parent" doctrine, citing a tentative draft of the American Law Institute and cases from other States. We are told that a "de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent. . . . The de facto parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide." *Ante* at 829.

Although the law of the Commonwealth has never recognized such a concept, and indeed in *C.M.* v. *P.R.*, *supra* at 224, in effect rejected it, the court discusses its application here as though it were neither new nor remarkable. The number of fresh avenues for judicial intervention created by this rule is limited only by the number of possible family arrangements in which adults and children live in the same household. In adopting the rule, the court strives to provide for the special needs of "nontraditional families," yet it is just because many families are non-traditional that the rule creates such a potential for unwarranted judicial intrusion into family relations.[4] One could imagine many situations in which an adult, legally a stranger to the child, might reside with the child's parents and, by participating in the child's upbringing to a certain degree, claim a legal status with respect to the child under the rule the court delivers today.

What defines the boundaries of the de facto parent doctrine?

---

[4]It should be noted that our law does make some such provisions. The Legislature provided for visitation rights for grandparents, see G. L. c. 119, § 39D, and we have recognized that the plaintiff would have been allowed, with the mother's consent, to adopt this child. See *Adoption of Tammy*, 416 Mass. 205 (1993).

The court provides no limit aside from the description set out above which, as we have seen, is hardly any limit at all. The court here makes much of the couple's decision together "to bring the child into the world," *ante* at 830, and the subsequent contract between the parties "in which they expressly stated their intent to coparent a child," *Ante* at 825. But the court does not explain why this particular litigant should be permitted to rely on a contract regarding the child's welfare instead of establishing parental rights through adoption. The failure to adopt specifically counted against the plaintiff's claim of parental rights in *C.M.* v. *P.R., supra* at 223 n.5. And it is clear from this court's decision in *Adoption of Tammy*, 416 Mass. 205 (1993), that the plaintiff here would have been permitted to adopt if the child's mother had consented. Even the ALI tentative draft on which the court relies provides that "an adult who expects status as a parent should obtain that status through formal adoption, if available under the applicable State law. Failure to adopt the child when it would have been possible is some evidence" that the person's relationship with the child does not rise to the level of de facto parenthood. ALI Principles of the Law of Family Dissolution § 2.03 comment b, at 41 (Tent. Draft No. 3 Part 1 1998). Moreover, the draft identifies the "primary function of the [de facto parent] status" as "enabl[ing] the court to maintain relationships between children and adults who have functioned as parents when adoption was not possible or practical." *Id.*

Although the court expressly declines to reach the issue "whether a coparenting agreement executed by the parties is specifically enforceable," it is clear that it places great importance on the contract between the parties in this case. If it did not, its frequent mentions of that agreement would be irrelevant. The fact that an adult has agreed to assume responsibility for raising a child, apart from whether she has actually done so, is irrelevant to the child's best interests. It neither proves that the adult is fit to care for the child nor, in the case of an adult otherwise without any legal relationship to the child, that the child has some heightened bond of affection with the adult that justifies granting her visitation rights as the court has done here. Moreover, such a contract could not be binding on the Probate Court once that court had jurisdiction over the child's custody, as the court will not enforce agreements "concern[ing] children . . . that do not conform to the child's best interests."

*Wilcox* v. *Trautz,* 427 Mass. 326, 334 n.7 (1998).[5] See *R.R.* v. *M.H.,* 426 Mass. 501, 510-511 (1998); *Osborne* v. *Osborne,* 384 Mass. 591 (1981); *Knox* v. *Remick,* 371 Mass. 433, 437 (1976); *Jenkins* v. *Jenkins,* 304 Mass. 248, 250 (1939). Therefore, the fact that the parties expressed in the contract their "beliefs regarding the child's best interests" does not, as the court implies, entitle the agreement to any special deference.

Evidence of the great weight the court affords this agreement is the court's statement that the child's interest in maintaining his filial ties with the plaintiff counters the defendant's custodial interest. See *ante* at 833. The use of the adjective "filial" begs the question. I would have thought it quite clear that a Probate Court has no business interfering with a fit parent's upbringing of her child just because the Probate Court thinks that the child has an interest in maintaining certain "ties." Such a power surely would not extend to relationships with teachers, schoolmates, clergy, or friends. So the adjective "filial" must be doing all the work here. The court is trying to show that there is something so special about this relationship that it may be distinguished from all those other ties, including, I suppose, that of the former male partner in *C.M.* But there is nothing about the child's interests that justifies the distinction; a child might be as emotionally attached to friends, teachers, schoolmates, or the child's mother's former boy friend, as to someone in the plaintiff's position. It is, rather, the plaintiff's interests and the arrangements the plaintiff made with the mother that are treated as distinctive here. To see these arrangements as rendering the ties "filial" is indeed to promote those contractual arrangements to a special status.[6]

What the court must be saying is that a contract of union

---

[5]It is surprising that the court cites *Wilcox* v. *Trautz,* 427 Mass. 326 (1998), as if it somehow supported its decision, and its parenthetical characterization of footnote 7 in *Wilcox,* from which the court appears to draw comfort, is even more surprising. The full text of that footnote is as follows:

> "The parties have no children, and thus the agreement did not raise any issues regarding the legal restrictions on their ability to affect the rights of their children by the agreement. As to agreements that do concern children, we would not, in any event, enforce those that do not conform to the children's best interests" (citations omitted).

*Id.* at 334 n.7.

[6]The court does suggest, *ante* at 829, that a judge may consider the factors set out in this court's decision in *C.C.* v. *A.B.,* 406 Mass. 679 (1990), but the

between a same-sex couple creating expectations of mutual care for a child stands on a special footing. The subject of same-sex unions is difficult, controversial, and important. The court's decision is a clear step in granting legal force to such unions. But if that is what the court intends, it should say so directly. See Shapiro, In Defense of Judicial Candor, 100 Harv. L. Rev. 731 (1987). In my view, it is precisely the sort of question that deserves the attention of the Legislature. We should not back into it by indirection, as the court does here.

A bold statement granting judicial recognition to same-sex unions would at least place quite distinct limits, analogous to those now familiar to the law, on the otherwise utterly amorphous authority the court seems to bestow today. Thus the danger that the court's decision might be used in as yet unforeseen circumstances to deprive parents of their constitutionally protected relationships with their children would be diminished. This is not to say that limiting the court's decision to same-sex unions would eliminate all ambiguity. Many vexing questions would remain. What exactly is to count as such a marriage-like commitment? When does a coparenting agreement constitute the equivalent of such a commitment? Is either sufficient to create the rights the court seems to acknowledge today, or are both necessary? How is such a union to be terminated, and what are the other incidents — support and alimony, for instance — that may arise when it is terminated? Only the Legislature is in a position to deal systematically and comprehensively with this important subject. Our imprecise, indirect, and piecemeal entry into this field can only cause confusion.

## IV

Of course, if there is some constitutional basis for the recogni-

facts of that case were very similar to the facts in *C.M.* v. *P.R.*, 420 Mass. 220 (1995), which this court does not view as presenting a de facto parenthood situation. The only distinction to which the court can point is that "[u]nlike C.M., the plaintiff before us was intimately involved in the decision to bring the child into the world." *Ante* at 830. This is yet another indication of the deferential treatment the court accords to the agreement between the plaintiff and the mother.

Notably, the court fails to point out that the distinction between *C.M.* v. *P.R.* and *C.C.* v. *A.B.* is not some amorphous consideration of which plaintiff had a stronger emotional bond with the child, but that the plaintiff in *C.C.* alleged biological paternity, whereas the plaintiff in *C.M.* did not.

tion of same-sex marriages, the matter is no longer entirely at the Legislature's discretion. By its emphasis on the marriage-like arrangements and agreements between the plaintiff and the mother, which are hardly relevant to the purported basis of the court's decision — the best interests of the child — the court appears to take a step in that direction.

And how else can the court find enough to outweigh what the court admits is a long-standing constitutional right — the "fundamental liberty interest" of parents in raising their children without interference by the State? *Santosky* v. *Kramer*, 455 U.S. 745, 753 (1982). See *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972). The court states that "[p]arental rights . . . are not absolute." *Ante* at 832. But this maxim is taken completely out of context, for the cases in which parental rights have been trumped by the best interests of the child or other concerns are those in which there has been an allegation of abuse or an allegation that a parent has withheld necessities such as medical care, or where the parent has consented to the child's adoption by another person. The court attempts to bolster its dismissal of the defendant's claim that her parental rights should take precedence by noting that a court is constitutionally permitted to order postadoption visitation with a child by members of the child's biological family and that courts are also permitted to order visitation by grandparents. These examples are entirely irrelevant. In the case of postadoption visitation by an adoptee's natural family, the court already has jurisdiction over the welfare of the child and determines that, in the best interests of the child, postadoption visitation should be incidental to the adoption. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984). In this case, by contrast, there is no such basis for interfering with the prerogatives of a child's legal parent. The court's reliance on grandparent visitation rights is equally unhelpful to its case. The Legislature has explicitly created such rights for grandparents, see G. L. c. 119, § 39D, and, as the Appeals Court has noted, there is no common-law right to grandparent visitation. See *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 323 n.11 (1995). The Legislature has made no such decision with respect to visitation by third parties not related to the child.