Smith *v.* Jones.

ALICE SMITH *vs.* BETH JONES.[1]

No. 06-P-1045.

Suffolk. March 15, 2007. - June 22, 2007.

Present: BERRY, SMITH, & DOERFER, JJ.

*Parent and Child,* Custody. *Minor,* Custody. *Words,* "De facto parent."

A Probate and Family Court judge acted within his discretion in dismissing the plaintiff's complaint seeking to be adjudged a de facto parent of the adopted child of the defendant (the plaintiff's former partner), where the disruption of the child's relationship with the plaintiff was not likely to cause significant harm to the child, and any harm would be sufficiently mitigated in concrete ways by the child's good relationship with the defendant; and where evidence of the defendant's intent to coparent with the plaintiff before the dissolution of their relationship was weak. [402-408]

CIVIL ACTION commenced in the Suffolk Division of the Probate and Family Court Department on August 2, 2004.

The case was heard by *John M. Smoot,* J.

*Rebecca L. Rose* for the plaintiff.

*Jo Ann Citron* for the defendant.

DOERFER, J. The appellant, Smith, appeals from a Probate and Family Court judgment dismissing her complaint seeking to be adjudged a de facto parent of Liza, her former partner's adopted child. The trial judge found that Smith met her burden of proving many of the major elements of de facto parenting, including that she performed an equal amount or more of the caretaking of the child, and that she "participated in [Liza's] life as a member of her family." Nonetheless, he concluded that her status did not reach that of a de facto parent, basing his conclu-

---

[1]Throughout this opinion, we use the following pseudonyms: the appellant shall be called Alice Smith; the appellee is denominated Beth Jones; Smith's adopted child is called Rose, and Jones's adopted child (the subject of this suit) is called Liza. This case was impounded by order of the Probate and Family Court on April 14, 2006, which order was enforced in this court.

sion on the absence of four criteria: "intent, time, harm, and 'best interests.' " We affirm.

*Facts.* We summarize only briefly the extensive and thoughtful findings of the trial judge, including additional uncontested facts where they become relevant to our discussion. In 1995, Smith and Jones, two women, met and began a relationship that lasted around nine years. In 1997, they began living together at Jones's house in Boston. In 2000, Smith adopted a child, Rose, from Russia. Because the adoption was international, coadoption by Smith and Jones together was not immediately available; however, given the opportunity, Jones did not elect to coadopt Rose when it later became a possibility. No coadoption of Rose ever took place, and no parenting agreement was entered into by the parties. Jones was a coguardian of Rose for the purpose of providing health care to her through Jones's employer, but resigned as coguardian upon the filing of this lawsuit.

In 2002, Jones traveled alone to Russia to adopt Liza, the child involved in the current dispute. She proceeded with the adoption without consulting Smith about the decision to choose the girl from among all the children available at the Russian orphanage. After Russian authorities approved the adoption and Jones removed Liza from the orphanage, Smith met Jones in Moscow, and the two women and the child traveled home together. For the first few months postadoption, most of Liza's caretaking was performed by Jones. When Jones returned to work, the parties shared morning caretaking responsibilities for Liza, and Smith was her sole caretaker during the day. When Liza developed medical complications, Jones took her to doctors' appointments and follow-up visits, stayed home with her when necessary, and was the sole decision maker and authority regarding medical procedures for the child.

Throughout their relationship, the parties maintained separate bank accounts and did not commingle their finances. They did not enter into a civil union in any jurisdiction or register as domestic partners.[2] The relationship between them dissolved around April, 2004. Throughout June and July, 2004, the parties

---

[2]*Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 344 (2003) was not effective until May 17, 2004, after the parties' relationship had ended. Marriage was not an available option for the couple during their relationship.

arranged for joint visits with both of the children. Smith filed for joint legal and physical custody of Liza in August of 2004, and the judgment appealed here was issued in April, 2006.

*Discussion.* The Supreme Judicial Court clarified the law of de facto parenthood recently in *A.H.* v. *M.P.*, 447 Mass. 828, 837 (2006) (*A.H.*), stating:

> "We have recognized that, in certain limited circumstances, a child may, with the legal parent's assent, have developed a 'significant preexisting relationship' with an adult who is not the child's legal parent 'that would allow an inference, when evaluating a child's best interests, that measurable harm would befall the child on the disruption of that relationship.' *Care & Protection of Sharlene*, 445 Mass. 756, 767 (2006), and cases cited. One such circumstance exists when the adult who is not the legal parent is found to meet the criteria of a 'de facto parent.' 'A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent. . . . The de facto parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide.' *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829[, cert. denied, 528 U.S. 1005] (1999)." (Footnote omitted.)

The court in *A.H.* pointed approvingly to the definition of a de facto parent included in ALI Principles of the Law of Family Dissolution § 2.03(1)(c) (2002) (ALI Principles): "an individual other than a legal parent . . . who, for a significant period of time not less than two years . . . for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions, (A) regularly performed a majority of the caretaking functions for the child, or (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived." The court made clear that the central

inquiry must be the best interests of the child. See *A.H.*, *supra* at 837 n.12.[3] Cases applying de facto parenthood analyses, like cases in any other area of family law, are highly fact specific and reflect the inevitable and infinite complexities of family formation, maintenance, and dissolution.

In *A.H.*, the court upheld the trial judge's conclusion that the plaintiff was not a de facto parent. There, the trial judge found that the plaintiff failed to meet her burden because, among other reasons, "the plaintiff's efforts during the relationship toward the child's care were not equal either in quantity or quality to those of the defendant, . . . the plaintiff had failed to prove that continued contact between the plaintiff and the child was in [the child's] best interests, . . . visitation would not be in the child's best interests because the plaintiff, 'in direct contravention of both the parties' previous practices and common sense . . . selectively ignored [the defendant's] directives regarding the child's care and custody,' and . . . the child would not suffer irreparable harm from the severing of his contact with the plaintiff." *Id.* at 836.

To the contrary, in *E.N.O.* v. *L.M.M.*, 429 Mass. at 825, the court concluded the plaintiff was a de facto parent of her partner's biological child where the plaintiff and defendant, a couple for thirteen years, had "availed themselves of every legal mechanism for signifying themselves life partners." They decided together to become parents, participated together in all prenatal care and medical decisions, and executed a coparenting agreement as to the child in question. *Id.* at 825-826. The child told people he had two mothers, and called one parent "mommy" and the other "mama." *Id.* at 826. Applying many of the factors highlighted in the ALI Principles, the court concluded that "[w]ith the defendant's consent, the plaintiff participated in raising the child, acting in all respects as a de facto parent. . . . The defendant encouraged the plaintiff's parental role, representing the plaintiff as the child's parent in her public dealings and expressing her desire that the plaintiff care for the child as a parent. The defen-

---

[3]Of course, "the best interests standard comes into play only after a judge has determined that a 'significant preexisting relationship' has created the requisite parent-child attachment that argues for visitation." *Ibid.*

dant authorized the plaintiff to make medical decisions for the child and designated the plaintiff as the child's guardian . . . . Thus, on these facts, the best interests of the child require that the plaintiff, as the child's de facto parent, be allowed temporary visitation with the child." *Id.* at 831-832 (footnote omitted).[4]

The facts of the present case locate it somewhere in the middle of the path established by the cases described above. Faced with facts so situated within the spectrum, it was squarely within the trial judge's discretion to weigh the many factors and variables suggested by the court and the ALI Principles. As in other contexts where cases center on the best interests of the child, we will not disturb the judge's findings or substitute our judgment for that of the trial judge absent clear error. See *Mason* v. *Coleman*, 447 Mass. 177, 186 (2006); *A.H., supra* at 838. On appeal, Smith does not argue that the findings of the trial judge are clearly erroneous; rather, she claims that the judge erred in his application of the de facto parenthood analysis to the facts of her case.

As noted above, the trial judge found the lack of several criteria fatal to Smith's bid for de facto parenthood status: time, intent, harm, and best interests. We now consider these criteria and conclude that the judge correctly applied the legal standards relevant to each, and was supported in his conclusions.

Most importantly, as to considerations of "harm" and "best interests of the child," the Supreme Judicial Court has made clear that its "cases, and those of the Appeals Court, . . . have focused exclusively on the existence of a significant preexisting relationship that would allow an inference, when evaluating a child's best interests, that measurable harm would befall the child on the disruption of that relationship." *Care & Protection of Sharlene*, 445 Mass. at 767 (citations omitted). Particular and significant harm may befall a child when the potential separation is from a person the child knows as a parental figure. See *Paternity of Cheryl*, 434 Mass. 23, 31-32 (2001); *A.H., supra* at 838. "[P]otential harm to the child is, of course, the criterion

---

[4]Similarly, in *Youmans* v. *Ramos*, 429 Mass. 774, 779 (1999), the court allowed a child's aunt to visit the child over the objection of a fit legal father, because the aunt had raised the child for almost all of her life until the father asserted his right to custody.

that tips the balance in favor of continuing contact with a de facto parent against the wishes of the fit legal parent, who has 'fundamental liberty interests' in the child's care, custody, and control." *A.H.*, *supra* at 840, quoting from *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000) (citations omitted).

In *A.H.*, the court revisited the best interests analysis in this context, stating: "The focus on caretaking in the ALI Principles is one means by which to anchor the best interests of the child analysis in an objectively reasonable assessment of whether disruption of the adult-child relationship is potentially harmful to the child's best interests." *A.H.*, *supra* at 839-840, citing ALI Principles § 2.02 comment b, at 96. Of course, "[a] judge has broad discretion to consider any factor that bears on the child's best interests. . . . Absent clear error, we will not substitute our weighing of the evidence for that of a trial judge who had the opportunity to observe the witnesses and form conclusions about their credibility, even if our weighing of the evidence might have differed from that of the judge." *A.H.*, *supra* at 838 (citations omitted).

Further, "the best interests calculus must include an examination of the child's relationship with both his legal and de facto parent." *E.N.O.* v. *L.M.M.*, 429 Mass. at 829. The trial judge here found that although Liza has an attachment to Smith, "the disruption of [Liza's] relationship with the plaintiff is not likely to cause significant harm to [Liza] . . . ." The facts found by the trial judge concerning caretaking and medical decision-making, as well as Liza's attachment to the two women, support this conclusion. We discern no clear error in the analysis of harm and best interests, and we will not substitute our judgment for that of the trial judge.

Even were we to accept Smith's interpretation of the trial judge's conclusion, that some harm will befall Liza upon the severance of her relationship to Smith, the trial judge further specifically found,[5] with support in the record, that such harm will be sufficiently mitigated in concrete ways by Liza's good relationship with Jones and through other resources. See *Adop-*

---

[5] We note that in *A.H.*, *supra* at 841, the court pointed out that the "judge explained her reasoning in detail" on the issue of the child's attachment to the parties.

*tion of Hugo*, 428 Mass. 219, 229-230 (1998), cert. denied, 526 U.S. 1034 (1999).

As to the second missing factor cited by the trial judge, "intent," the relevant facts are those tending to show whether the parties intended to coparent *before* the dissolution of their relationship.[6] "There is no surer way to find out what parties meant, than to see what they have done." See *T.F.* v. *B.L.*, 442 Mass. 522, 525 (2004), quoting from *Pittsfield & N. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 (1927). For guidance on this factor, the Supreme Judicial Court, see *A.H.*, *supra* at 837, directs us again to the ALI Principles § 2.03, the comments to which include a section entitled "Agreement of a parent to the de facto parent relationship." See ALI Principles § 2.03 comment c (iii), at 121.[7] Although a matter of discretion, the ALI Principles factors relevant to intent or agreement can be summarized as follows: (1) the legal parent must know about and agree to caretaking by the de facto parent, which agreement can be objectively expressed or inferred; (2) the legal parent must objectively show a willingness to share parental responsibilities; (3) mere babysitting will not suffice; and (4) a lack of agreement can be inferred from the retention of certain kinds of authority, including discipline.

As to the fourth of these considerations, the trial judge found that Jones retained certain kinds of authority, most notably, the authority over medical decisions affecting Liza. In addition, he found that Jones did not cede significant responsibilities to Smith, as illustrated by her choice not to name Smith as Liza's

---

[6]We note that the word "intent" does not appear in the relevant sections of the ALI Principles. Rather, the focus is on the objectively appreciable indicia of acknowledgment and encouragement of the putative de facto parent by the legal parent.

[7]That comment states: "[A] de facto parent relationship cannot arise by accident, in secrecy, or as a result of improper behavior. The agreement requirement of Paragraph (1)(c)(ii) [of § 2.03] limits de facto parent status, in most circumstances, to those individuals whose relationship to the child has arisen with knowledge and agreement of the legal parent. Although agreement may be implied by the circumstances, it requires an affirmative act or acts by the legal parent demonstrating a willingness and an expectation of shared parental responsibilities. Agreement is not established by the mere delegation of babysitting duties to a roommate or an adult partner. Retention of authority over matters of the child's care, such as discipline, manifests an absence of agreement to the formation of a de facto parent relationship."

guardian in the event of her (Jones's) death. Considering the evidence as a whole, the judge concluded that Jones's "intent" to coparent was weak at best, as evidenced by her actions, such as traveling alone to Russia to adopt a child and choosing Liza without consulting Smith.[8]

With ample support in the case law of this State, the trial judge found that the failure of the parties to coadopt or execute a coparenting agreement, alone, was not determinative on the issue of de facto parenthood status. See, e.g., *E.N.O.* v. *L.M.M.*, 429 Mass. at 831 n.10.[9] However, the judge considered the reasons underlying this choice contextually and along side many other factors bearing on de facto parenthood, including the following: Jones indicated to the adoption agency that she intended to designate her sister, rather than Smith, as guardian of Liza, so that the sister would care for Liza in the event of Jones's death or incapacity; Jones proceeded with the adoption of Liza without consulting Smith before making a final decision; Jones, alone, gave the child her own last name despite Smith's desire that Liza share their last names; Jones signed a consent form for major surgery for Liza without consulting Smith; Jones attended

---

[8] It follows from the ALI Principles and the cases that deciphering a parent's "intent" requires analysis of objective, observable indicia of agreement or lack of agreement to allow caretaking, responsibility, and decision-making rather than a query into the legal parent's subjective idea about shared parenthood at any one point in the relationship. Just as de facto parenthood cannot arise "in secrecy," see ALI Principles § 2.03 comment c (iii), at 121, neither can a legal parent give a consistent, outward appearance of allowing her partner to parent their child, encouraging a relationship between that person and the child, while secretly withdrawing such allowance. Because the touchstone of these cases is always the best interests of the child, see *A.H.*, *supra* at 837 n.12, any secret withdrawal of this type would not eviscerate the key importance of the existing relationship between the second caretaker and the child. In this case, Jones's behavior provided objective indicia concerning a lack of agreement to coparent.

[9] "Failure to adopt the child when it would have been possible is some evidence, although not dispositive, that the legal parent did not agree to the formation of the de facto parent relationship." ALI Principles § 2.03 comment c, at 119. Nonetheless, as did the courts in *A.H.*, the trial judge in this case found the lack of coadoption a compelling factor, given the reasons that choice was made. See *A.H.*, *supra* at 829-830. He stated: "The parties are two sophisticated people who had access to a capable first-rate lawyer with expertise on co-parenting agreements. There was no co-adoption of [Liza] and there was no co-parenting agreement concerning [Liza *because the defendant did not want a permanent co-parenting arrangement*" (emphasis added).

follow-up visits without Smith; and Jones did not authorize Smith to sign medical forms or make any medical decisions regarding Liza.[10] None of the findings having been challenged as clearly erroneous, we cannot say that the judge erred in his analysis of Jones's intent to coparent Liza with Smith.

*Conclusion.* The trial judge weighed the factors relevant to a de facto parenthood status analysis, and applied the correct legal standards in doing so. Nothing in *A.H.* v. *M.P.*, 447 Mass. at 837-842, decided after the Probate and Family Court decision here, changed that analysis in a way applicable to this case.[11]

*Judgment affirmed.*

---

[10]As to the "time" element of the de facto parenthood analysis, we recognize that the ALI Principles would mandate a two-year minimum during which time the purported de facto parent must dwell with the child. See ALI Principles § 2.03(c) and comment c(iv). However, in *A.H.*, *supra* at 837 n.13, the court chose to "express no opinion on the [ALI's] two-year requirement." In this case, Smith resided with Liza for nineteen and one-half months. The trial judge made no findings or conclusions linking this time frame to the intensity or depth of the relationship between Liza and Smith; he did point out that the couples in the *E.N.O.* and *Youmans* cases had cohabitated with the subject children for three years and eleven years, respectively. Given the court's reluctance to adopt a bright-line time requirement in these contexts, we assume here that the failure to satisfy this element alone would not likely be sufficient for a conclusion that no de facto parenthood status existed.

[11]For example, the court in *A.H.* declined to adopt the doctrine of parenthood by estoppel, a doctrine not considered by the trial judge in this case. See *A.H.*, *supra* at 844-846. To the extent that the doctrine was argued on appeal, the issue is now moot.