2001 ME 52

**David B. STITHAM**

v.

**John C. HENDERSON.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Jan. 18, 2001.
Decided: April 3, 2001.

Jefferson T. Ashby, Hardings Law Offices, Presque Isle, for plaintiff.

Harlod L. Stewart II, Stewart Law Office, Presque Isle, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] John C. Henderson appeals from the summary judgment of the Superior Court (Aroostook County, *Pierson, J.*) in favor of David B. Stitham, declaring that Henderson is not the biological father of the minor child K.M.H. and declaring that Stitham is the child's biological father. Henderson further appeals from the order denying his motion to dismiss in which he requested a dismissal of Stitham's complaint on the basis of res judicata. Henderson also appeals the order dismissing his counterclaim in which he sought to establish his equitable parental rights. We affirm the judgment and orders of the Superior Court.

## I. BACKGROUND

[¶ 2] Henderson and Norma[1] were married in 1986. Norma gave birth to K.M.H. in 1993. Henderson was present at the birth and is named on the birth certificate as the father of K.M.H. He believed that he was the child's father, and he established and maintained a father-daughter relationship with her. His parents and the child had a grandparent-grandchild relationship. Henderson and Norma divorced in 1996, and they agreed to the terms of the divorce in a written document that was incorporated into the divorce judgment. The divorce judgment, entered in the District Court (Houlton, *Griffiths, J.*), awarded shared parental rights of the child to

---

1. Norma took the name of Henderson upon marriage to Henderson. Later, when she married Stitham she took the name of Stitham.

Henderson and Norma; granted primary physical residence of the child to Norma; awarded Henderson contact with the child at all reasonable and proper times; ordered Henderson to maintain health insurance for the child; and ordered Henderson to pay child support to Norma. Henderson has continued to pay Norma child support.

[¶ 3] A few months after the divorce, Norma and Stitham married, and they, along with the child, submitted to DNA testing to determine if Stitham is the child's biological father. The test results show Stitham's probability of paternity to be 99.96%. Thereafter, Norma filed a post-divorce motion in District Court in which she sought to obtain a declaration that Henderson was not the child's biological parent. Henderson objected, and the District Court denied Norma's motion on the ground of res judicata.

[¶ 4] In 1998, Stitham filed the instant action in Superior Court against Henderson. The complaint states that the action is brought pursuant to the Uniform Act on Paternity, 19–A M.R.S.A. §§ 1551–1570 (1998 & Supp.2000), and requests that Stitham be declared the child's biological father.[2] Henderson moved to dismiss the complaint on the ground of res judicata, and the court denied the motion. The court ordered Henderson to submit to DNA testing, and the test results exclude Henderson as the biological father of K.M.H.

[¶ 5] After the DNA test results were obtained, Henderson brought a motion to allow a counterclaim to establish his equitable parental rights. Stitham objected to the motion on the ground that the counterclaim was untimely. Stitham moved for summary judgment on his complaint to which Henderson objected. The court granted Stitham's summary judgment motion and Henderson's motion to file the

counterclaim, but it dismissed the counterclaim without prejudice as not being ripe for adjudication. The judgment declares that Henderson is not the child's biological father and that Stitham is the biological father.

## II. RES JUDICATA

[¶ 6] Henderson contends that Stitham's complaint for a declaration of paternity is barred by res judicata because the 1996 divorce judgment between Henderson and Norma determined that Henderson is the father of the child. We have said that res judicata bars relitigation if: "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action." *Dep't of Human Servs. ex rel. Boulanger v. Comeau,* 663 A.2d 46, 48 (Me.1995).

[¶ 7] Stitham was not a party to the divorce between Norma and Henderson, and therefore, he is not barred from litigating his paternity claim unless he was in privity with Norma. For the doctrine of res judicata to apply on the basis of privity, Henderson must demonstrate that the rights and interests of Stitham were substantially represented and protected by Norma in the divorce proceeding. *See id.* For there to be privity between Norma and Stitham at the time of the divorce, the two had to have a mutual relationship that established a commonality of interest. Their interests in the divorce litigation had to be such that they represented one single right. *Id.* We have held that neither a child nor the Department of Human Services is in privity with the child's mother when she settles an action to determine the paternity of the child. *Dep't of Human Servs. v. Webster,* 398 A.2d 792, 794 (Me.1979). *But see Dep't of Human*

---

**2.** Although the Superior Court had concurrent jurisdiction with the District Court over paternity actions when Stitham filed his complaint, recent legislation has given the District

Court exclusive jurisdiction over these actions. 19–A M.R.S.A. § 1556 (Supp.2000), *amended by* P.L.1999, ch. 731, § ZZZ–32 (effective Jan. 1, 2001).

*Servs. v. Richardson,* 621 A.2d 855, 856–57 (Me.1993) (holding Department in privity with mother where Department on notice of alleged father's pending paternity action in which judgment of nonpaternity entered).

[¶ 8] The interests of a biological mother and a biological father are not identical in actions in which paternity may be determined. The biological mother may not want the paternity of the biological father determined because she does not want him to establish a relationship with the child, or she does not want him to be allocated rights in the upbringing of the child. The determination of paternity can include, or at least lead to, visitation with the child, decision-making regarding the education and medical care of the child, and various legal and moral duties. The finances of the mother, her husband, and the biological father may be such that the mother's best hope for ongoing financial support for a child is from the husband rather than the biological father. The mother may choose not to complicate divorce proceedings by injecting a disputed paternity claim into the action. Henderson, as the party claiming res judicata, has offered nothing to indicate that the actual situation of Norma and Stitham, at the time of the District Court divorce judgment, was such that Norma was in fact representing Stitham's interest. Although Norma and Stitham are married now, and it may be safe to assume that their interests currently are aligned, no such assumption can be made that their interests were identical at the time Norma and Henderson were divorced.

[¶ 9] We have held that a court-approved settlement of a paternity action between the biological parents is not binding on nonparties and does not bar either the child or the Department of Human Services from litigating paternity. *Webster,* 398 A.2d at 794. The divorce between Henderson and Norma was by agreement, and the issue of paternity was not raised before the court. This fact alone démon-strates the divergence of interests between Stitham and Norma. Norma did not represent Stitham's interest during the divorce proceeding. Norma and Stitham were not in privity, and for this reason the doctrine of res judicata does not act as a bar to Stitham's action to determine his paternity.

## III. SUMMARY JUDGMENT

[¶ 10] It is well-established that when we review the grant of summary judgment, we consider the evidence in the light most favorable to the party against whom the judgment is issued, and we will only affirm the judgment if a review of the record demonstrates that there is no genuine is-sue of material fact and the grant of the judgment was correct as a matter of law. *Cyr v. Adamar Assocs.,* 2000 ME 110, ¶ 4, 752 A.2d 603, 604. Henderson claims that summary judgment should not have been granted against him for three reasons: (1) the Maine Uniform Act on Paternity does not allow a paternity action when the child was born to a married woman; (2) the DNA test results are not dispositive, and there was a genuine issue of fact as to the paternity of the child; and (3) Henderson was entitled to the presumption of legitimacy.

[¶ 11] Henderson first contends that Maine's version of the Uniform Act on Paternity does not allow Stitham to bring the action because the Act was not intended to allow a party to establish that the father of a child born to a married woman is anyone other than the woman's husband. He points to the definition, included in the uniform act, but omitted from the Maine version, that "a child born out of wedlock includes a child born to a married woman by a man other that her husband." UNIF. ACT ON PATERNITY § 1, 9B U.L.A. 350 (1987). However, in *Denbow v. Harris,* 583 A.2d 205, 207 (Me.1990), we concluded that the definition in the uniform act is "mere surplusage." There, the mother of a child born while the mother was married brought a paternity action against a man

to whom she had not been married. He defended on the ground that the Maine Legislature, by its failure to enact the uniform act's definition of "born out of wedlock," intended to limit paternity actions to circumstances where children were born to unmarried women. We rejected that argument and noted that the dictionary definition of "out of wedlock" is "with the natural parents not legally married to each other." *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 2592 (1986)). The precise holding in *Denbow* was: "The Uniform Act on Paternity allows a paternity action even when the child is born to a mother who is married." *Denbow,* 583 A.2d at 207. Although the present action is brought by a father to establish paternity, rather than a mother as in *Denbow,* the holding of *Denbow* is controlling.

■ [¶ 12] Henderson next claims that summary judgment was inappropriate because the DNA test results are not dispositive and there remains a genuine issue as to the paternity of the child. Henderson has not presented his own expert or otherwise challenged the validity of the DNA tests. Those test results exclude Henderson as the biological father and state that the probability that Stitham is the biological father is 99.96%. The test result provision in the Uniform Act on Paternity, 19–A M.R.S.A. § 1561 (1998), declares that if the tests demonstrate that the "alleged father" is not the father, "the question of paternity must be resolved accordingly." *Id.* § 1561(1)(A).[3] Given that the test results are not disputed, there is

no genuine dispute that Henderson is not the biological father. Thus, a summary judgment declaring that Henderson is not the child's biological father was proper.

[¶ 13] The summary judgment declaring that Stitham is the child's biological father was also proper. Under the Act, because Stitham is not excluded by the DNA tests as the father and because the percentage of probability of his paternity is higher than 97%, he is presumed to be the father. *Id.* § 1561(1)(D). Pursuant to 19–A M.R.S.A. § 1562 (1998), the presumption of paternity can only be overcome by clear and convincing evidence. Nothing in Henderson's statement of material facts, submitted pursuant to M.R. Civ. P. 7(d), shows any evidence to rebut the presumption.[4] The Superior Court did not err in concluding that there were no facts to rebut the presumption of Stitham's paternity.

■ [¶ 14] Finally, Henderson contends that he was not given the benefit of M.R. Evid. 302 on the presumption of legitimacy. Rule 302 states that a party asserting the illegitimacy of a child born to, or conceived by, a married woman has the burden of proving illegitimacy beyond a reasonable doubt. However, 19–A M.R.S.A. § 1564 (1998) states that Rule 302 is not applicable when "reliable blood or tissue tests show that the presumed father is not the biological parent," *id.* § 1564(1)(A), or the "tests show that the alleged father is not excluded and that the probability of the alleged father's paternity is 97% or higher," *id.* § 1564(1)(B). This statute plainly excludes the applicability of the

---

**3.** Henderson argues that the term "alleged father" as used in the Act refers to Stitham. A thorough reading of all of the sections in the Act in which the term is used, however, clearly indicates that in a case where there are two men who both claim, or are claimed to be, the father of the child, both can be the "alleged father." Indeed, both allege that they are the child's father. Because they both allege themselves as fathers, either could have brought the action since the Act allows an "alleged father" to file a complaint. 19–A M.R.S.A. § 1553 (1998). Either could have

been ordered by the court to participate in DNA testing. 19–A M.R.S.A. § 1558 (1998). Henderson's argument that only Stitham can be considered the "alleged father" because Stitham brought the action is without merit.

**4.** At the time the parties filed their statements of material facts, M.R. Civ. P. 7(d) was the applicable rule. Effective January 1, 2001, Rule 7(d) was abrogated and M.R. Civ. P. 56(h), which now governs such statements, was adopted.

Rule 302 presumption, and Henderson is not entitled to the presumption of legitimacy.

## IV. COUNTERCLAIM TO ESTABLISH EQUITABLE PARENTAL RIGHTS

■ [¶ 15] The Superior Court allowed Henderson to file a late counterclaim to establish his equitable parental rights, but dismissed it without prejudice because (1) Norma is not a party; (2) Stitham did not request any relief concerning his rights with the child other than the declaration of paternity; and (3) a post-divorce motion, brought by Henderson to enforce visitation, is pending in the District Court. The court concluded that in order "to afford [Henderson] a full panoply of remedies in the District Court," it would dismiss the counterclaim without prejudice.[5] We conclude that the Superior Court was correct in dismissing the counterclaim.

■ [¶ 16] Henderson argues that he is entitled to a jury trial on his counterclaim, and the Superior Court is the only forum in which he can have a jury trial. He has failed, however, to cite any authority for an entitlement to a jury trial on a claim of equitable parental rights. To the extent that he has equitable parental rights with regard to K.M.H., the exercise of such rights is totally dependent upon a determination of the best interests of K.M.H. Matters involving the custody or best interests of a child are equitable in nature and are not for determination by a jury. *See In re Shane T.*, 544 A.2d 1295, 1296–97 (Me.1988) (holding father not entitled to jury trial in termination of parental rights case and discussing the equitable origins of custody determinations).

[¶ 17] A post-divorce motion is pending in the District Court concerning Henderson's right of contact with the child. The District Court has jurisdiction to determine the parental rights regarding the children before it in divorce and post-divorce matters.[6] 19–A M.R.S.A. §§ 1001, 1653(10) (1998). Until the Superior Court's declaration that Henderson is not the biological father, Henderson was the legal father to K.M.H. The parent-child relationship, shown by the undisputed facts and by his affidavit, places him in the position of a de facto parent. Because of his prior legal relationship to the child and his current role as a de facto parent, the District Court has jurisdiction to decide whether it is in the best interests of K.M.H. for Henderson to have a continuing role in her life and what that role should be.

[¶ 18] Hopefully, these parties, keeping the best interests of the child uppermost in their minds, either on their own, or with the assistance of an able case management

---

5. The District Court is the forum where sensitive family matters should ordinarily be resolved. The District Court now has exclusive jurisdiction in most family matter cases. *See, e.g.*, P.L.1999, ch. 731, § ZZZ–4 (effective Jan. 1, 2001) (codified at 4 M.R.S.A. § 152(11) (Supp.2000)) (giving the District Court exclusive jurisdiction in divorce, annulment, and judicial separation actions); 19–A M.R.S.A. § 1556 (Supp.2000), *amended by* P.L.1999, ch. 731, § ZZZ–32 (effective Jan. 1, 2001) (giving the District Court exclusive jurisdiction in paternity actions). The District Court includes the Family Court Division with case management officers for the purpose of managing and expediting such matters. 4 M.R.S.A. § 183 (Supp.2000); R. Fam. Div. Dist. Ct. 1, Me. Rptr., 699–709 A.2d CXXI–CXXII.

6. The District Court also has the statutory authority to award contact with a child to a third party. 19–A M.R.S.A. § 1653(2)(B) (1998). Although this provision could not be interpreted to allow a court to give contact to a person with a limited relationship to the child, over the objections of the parents, Henderson is a person with significant bonds to the child, even if he needs to be placed into the status of a third party. *See Rideout v. Riendeau*, 2000 ME 198, ¶¶ 27, 33, 761 A.2d 291, 302–03 (upholding the constitutionality of the Grandparent Visitation Act, 19–A M.R.S.A. §§ 1801–1805 (1998 & Supp.2000). by narrowly interpreting it to allow grandparents, who had functioned as parents to children for a significant period of time, to invoke the parens patriae authority of the court and seek contact with the children).

officer and/or mediator, will agree upon the best arrangement for the child. We recognize that Stitham is not a party in the District Court proceeding, but the District Court may find it appropriate to permit Stitham, who has now been declared to be the biological father, to intervene if he so requests.[7]

The entry is:

Judgment affirmed.

SAUFLEY, J., files a concurring opinion joined by ALEXANDER and DANA, JJ.

SAUFLEY, J., with whom ALEXANDER, J. and DANA, J., join, concurring.

[¶ 19] I concur in the Court's analysis and the result in this matter. I write separately to address the Court's reference to the de facto parenthood of Henderson and the area of law that is emerging from the intersection of traditional social policies and modern biological testing abilities.

[¶ 20] For centuries, a child born during a marriage was considered the child of the parties to the marriage, regardless of contrary allegations of paternity. See Ventresco v. Bushey, 159 Me. 241, 191 A.2d 104, 106 (1963). As a matter of public policy, this approach was necessary to prevent "bastardization" and to preclude unwarranted intrusions into family peace and harmony. See Atkinson v. Atkinson, 160 Mich.App. 601, 408 N.W.2d 516, 518 (1987). From a practical perspective, evidentiary

proof of paternity was also difficult and unreliable.[8] See Denbow v. Harris, 583 A.2d 205, 206 (Me.1990) (noting that prior to blood tests, a baby was exhibited to the jury to show family resemblance).[9] As blood testing and methods of proof progressed, we repudiated the absolute presumption of paternity in 1963, allowing the rebuttal of the presumption by proof beyond a reasonable doubt. See Ventresco, 191 A.2d at 108–09. That presumption was eventually embodied in the Rules of Evidence. See M.R. Evid. 302; Denbow, 583 A.2d at 206.

[¶ 21] With the recent advances in biotechnology and human genetics, family law is undergoing further evolution. Because testing is now sufficiently accurate, the presumption of paternity, a hurdle once very difficult to overcome, can now be swept aside by a simple test. See 19–A M.R.S.A. § 1561 (1998). As a result, there now exists the real possibility, as this case demonstrates, that one man may become the legally acknowledged biological father of a child, while another, through marriage to the mother, has been the legally acknowledged and factually involved father.

[¶ 22] The status of the father "by marriage," following an adjudication declaring that another man is the biological father, is not addressed consistently throughout the country. Some states have enacted statutes explicitly recognizing that a man married to a child's mother at the time of the child's birth is a legal parent, regardless of

7. We have held previously that a putative father, whose paternity has not been adjudicated, may not intervene as of right, pursuant to M.R. Civ. P. 24(a), in a post-divorce proceeding between the mother and her ex-husband where the child was born during the marriage of the mother and her ex-husband. Morrill v. Morrill, 632 A.2d 137, 138 (Me. 1993). We suggested the possibility that permissive intervention, under M.R. Civ. P. 24(b), might be allowed. Morrill, 632 A.2d at 138.

8. In an "action in bastardy," created to allow the adjudication of paternity in the absence of

marriage, the man was "accused" of paternity and found guilty or not guilty of being a father. If the mother identified the father "at the travail," signifying the period of time after the pains of labor had commenced but before the birth of the child, it was regarded as competent evidence of paternity. See Beals v. Furbish, 39 Me. 469 (1855).

9. This approach was later disapproved. See Overlock v. Hall, 81 Me. 348, 17 A. 169, 170 (1889) (holding that a complainant cannot offer a child into evidence for purposes of showing family resemblance).

the legal recognition of a different biological father.[10]

[¶ 23] Maine statutes are silent on the issue.[11] Maine law does, however, create an avenue for biological fathers to assert a claim of paternity, *see* 19–A M.R.S.A. § 1553 (1998), even when the child has a father who was previously understood to be the father because he was married to the mother at the time of the child's birth.[12] Thus, although the law recognizes the legal rights and responsibilities of the newly established biological father, it does not directly address the consequences of that legal recognition for the person who had previously thought himself to be the father.

[¶ 24] Although DNA testing may provide a bright line for determining the biological relationship between a man and a child, it does not and cannot define the human relationship between father and child. When a man has been newly determined to be the biological father of a child, the courts have a responsibility to assure that the child does not, without cause, lose the relationship with the person who has previously been acknowledged to be the father both in the law, through marriage, and in fact, through the development of the parental relationship over time.[13]

[¶ 25] In this developing area of law, and in the absence of legislative action, many questions remain unanswered.[14] However, we have today recognized that Henderson's previously existing legal and factual relationship to K.M.H. gives the District Court the authority to recognize Henderson as a de facto parent[15] and to act in the best interests of K.M.H. *See* AMERICAN LAW INSTITUTE, *Principles of the Law of Family Dissolution:*

---

10. *See, e.g.,* OKLA. STAT. ANN. tit. 10, § 3(B) (West 2000) ("If a child is born during the course of the marriage and is reared by the husband and wife as a member of their family without disputing the child's legitimacy for a period of at least two (2) years, the presumption cannot be disputed by anyone."); TENN. CODE ANN. § 36–1–102(26)(B) (2000) (including in the definition of "legal parent" a man "who is or has been married to the biological mother of the child if the child was born during the marriage"); W. VA. CODE § 48–4–1(i) (2000) (including in the definition of "legal father" a man "[w]ho is married to [the child's] mother at the time of conception" or "who is married to [the child's] mother at the time of birth of the child"); *Smith v. Cole*, 553 So.2d 847, 854 (La.1989) ("The legal tie of paternity will not be affected by subsequent proof of the child's actual biological tie.").

11. A father of a child born out of wedlock is liable for the support of the child to the same extent as a father of a child born in wedlock. 19–A M.R.S.A. § 1552 (1998).

12. As one author has noted, absent guidance from the courts, the results of such a system may be the unintended disruption of a stable family:

> This clash between the emotional and psychological value of families and the legal rules governing them has several adverse consequences. One consequence . . . is that biological fathers who have had no significant relationship with their children may

gain custody of them, even when it means breaking up a child's relationship with another man who has lived as the child's father and to whom the child may be very attached.

Leslie Joan Harris, *Reconsidering the Criteria for Legal Fatherhood*, 1996 UTAH L. REV. 461, 474 (1996).

13. *See, e.g., Rideout v. Riendeau*, 2000 ME 198, ¶ 28, 761 A.2d 291, 302 ("[T]he State has demonstrated that it has a compelling interest in providing a forum in which a grandparent, who has acted as a parent to the child . . . may seek continuing contact with the child.").

14. For example, historically, the concept of a "maternity test" was rarely discussed because the biological mother was, by definition, present at the birth of the child. Given advances in genetics, that assumption will not always hold.

15. One court has defined de facto parent in the following manner:

> A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent.

*E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 891 (1999).

*Analysis and Recommendations,* § 2.03(1)(c) (Tentative Draft No. 4, April 10, 2000).[16]

[¶ 26] Accordingly, one question has been resolved. When a man has been understood at law to have been the father of a child, through marriage to the child's mother, and the courts have determined that a different man is the biological father of the child, the District Court has the authority to determine, in the best interests of the child, whether the father by

marriage shall continue as a de facto parent and have a continuing relationship with the child.

[¶ 27] Thus, I concur in the opinion of the Court.

---

**16.** Section 2.03(1)(c) suggests the following standards for determining de facto parenthood:

(c) A *de facto parent* is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
   (i) lived with the child and,
   (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of

a complete failure or inability of any legal parent to perform caretaking functions,
   (A) regularly performed a majority of the caretaking functions for the child, or
   (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

AMERICAN LAW INSTITUTE, *Principles of the Law of Family Dissolution: Analysis and Recommendations,* § 2.03(i)(c) (Tentative Draft No. 4, April 10, 2000).