MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2025 ME 68
Docket:         Yor-24-218
Argued:         October 9, 2024
Decided:        July 29, 2025

Panel:          STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.
Majority:       STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.
Dissent:        HORTON, J.

KATRINA M. WELCH

v.

NAOMI R. CHAVAREE

DOUGLAS, J.

[¶1]  Katrina M. Welch appeals from a judgment of the District Court (Biddeford, *Sutton, J.*) dismissing for lack of standing her complaint pursuant to 19-A M.R.S. § 1891 (2025) for determination of de facto parentage with respect to the biological child of her former partner, Naomi R. Chavaree.  Welch contends that the court erred by determining that she did not have standing to proceed and abused its discretion by declining to hold a hearing when there were disputed facts material to the determination of standing.  We agree that in the particular circumstances presented here, the court abused its discretion in denying Welch's request for a hearing and we therefore vacate the dismissal.

## I. BACKGROUND

[¶2] Welch filed her complaint on February 26, 2024. Along with the complaint, she filed a motion for an expedited hearing and a supporting affidavit. The affidavit generally asserts, in accordance with the statutory prerequisites for standing, that Welch has (i) "undertaken a permanent, unequivocal, committed and responsible parental role"; (ii) established a "bonded and dependent relationship" with the child; (iii) "committed to maintaining a stable and consistent home" for the child; and (iv) "accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation." *See* 19-A M.R.S. § 1891(2), (3)(A)–(D). The affidavit further avers that it would be "in the best interest of the child" to continue the relationship and "detrimental to [the child] if [Welch] were not granted the right to remain in [the child's] life." *Id*. § 1891 (2), (3)(E).

[¶3] In support of these general statements, the affidavit also sets out the following specific factual assertions:

- Welch and Chavaree were in a relationship for approximately three years, from December 2017 to December 2020.

- Welch was "highly involved" during Chavaree's pregnancy—"attending prenatal classes," being "present for the entire 36-hour birth of [the child]," cutting the umbilical cord at birth, and taking time off from work after the birth to attend to the child's needs.

- Welch has been in the child's life since birth,[1] and "[i]t was intended that [Welch] would play a parental role in [the child's] life."

- Welch, Chavaree, and the child lived together from May 2018 to February 2021, and Welch "established a consistent home environment" with Chavaree and provided the child "with all normal living essentials."

- Welch played "an active role in all aspects of the child's life including waking up with her at night as an infant" and remained "highly involved," including matters such as "school, childcare, extracurricular activities and taking the child to medical appointments."

- Welch "[is] listed on [the child's] school paperwork as a parent."

- The child refers to Welch as "Gaga" and on occasion, "Mom."

- The child has a close relationship with some of Welch's extended family, including her grandmother, whom the child calls "Nana."

- Following the parties' separation, Welch has "continued to co-parent [the child]," who has weekly overnight visits and dinner visits with Welch.

- Welch "continue[s] to be involved in decision making for [the child's] day-to-day life."

[¶4]  On March 4, 2024, Chavaree filed an answer to the complaint and an objection to Welch's request for a hearing.  She filed a counter-affidavit to rebut Welch's assertions.  Much of Chavaree's affidavit is devoted to events that occurred after the parties ended their three-year relationship and separated. The assertions pertaining to the parties' relationship and Welch's role in raising

---

[1] The child was born in April 2018.

4

the child while living together and prior to their separation may be summarized as follows:

- Chavaree was already five months pregnant when the relationship began.

- Welch was Chavaree's "partner at the time" and "part of [their] lives," but there was "no intention of a full-time parental role" for Welch.

- "There was never a conversation about what role [Welch] would play in [the child's] life" or "a conversation about [Welch] being on the birth certificate, seeking to adopt [the child], or gain[ing] any legal rights, even though she was present at [the] birth."

- "It was understood by [Welch] that she was not going to be on the birth certificate and/or be a legal parent in [the child]'s life."

- "[Chavaree] made all decisions involving [her] pregnancy and the future of [the child] independently."

- Welch did not provide "[n]ormal living essentials" for the child and was not the "primary financial provider."

- "Childcare was always found and designated by [Chavaree] since [the child] was an infant," and Welch only paid a portion of the childcare expenses.

- "The relationship [Chavaree] had with [Welch] was not co-parenting."

[¶5]  On April 8, 2024, the court dismissed Welch's complaint for lack of standing based solely on a review of the pleadings and affidavits.  The court determined that despite the "relatively low" standard to establish standing, such a showing "cannot be made by [merely] reciting the statutory factors."  It concluded that "there are sufficiently undisputed facts within the competing

affidavits for the Court to conclude based on the affidavits that [Welch] has not made a *prima facie* showing, by the standard of a preponderance of the evidence, of all the elements listed in 19-A M.R.S. § 1891(3)."[2] The April 8 order also stated that Welch's request for an expedited hearing "is rendered moot by the court's decision that [Welch] lacks standing to proceed."

[¶6] Welch filed a motion for reconsideration pursuant to M.R. Civ. P. 59(e) and a motion for additional findings of fact pursuant to M.R. Civ. P. 52(b), arguing that the April 8 order "gives very little detail as to why Ms. Welch failed to meet the statutory factors" and fails to state which "undisputed facts" were sufficient to deny standing. Welch proposed additional and amended findings of fact and requested that the court reconsider its order or "set a time for hearing."

[¶7] In a May 17, 2024, order the court granted in part Welch's motion and made the following further findings:

---

[2] The trial court references two different standards of proof—"prima facie evidence" and "preponderance of the evidence"—in its standing analysis. The former derives from the Maine Parentage Act, which states that "[t]he court shall determine on the basis of the pleadings and affidavits . . . whether the person seeking to be adjudicated a de facto parent has presented prima facie evidence of the requirements set forth in subsection 3." 19-A M.R.S. § 1891(2)(C) (2025). The latter is based on our decision in *Davis v. McGuire*, in which we held that the higher standard of preponderance of the evidence was required at the standing phase of a de facto parentage proceeding due to "constitutional liberty interests arising from the parent-child relationship." 2018 ME 72, ¶¶ 16-23, 186 A.3d 837. Although a question has been raised as to whether the *Davis* standard is constitutionally required, *see Bagrii v. Campbell*, 2025 ME 38, ¶ 60 n.17, 334 A.3d 733 (Douglas, J., dissenting), *Davis* controls and requires Welch to demonstrate standing by a preponderance of the evidence.

> Based on the court's review of the pleadings and affidavits, [Welch] has not made prima facie showing of the entirety of subsection 3(C). [Welch] has not shown that the relationship that [Welch] posits by affidavit between [Welch] and the child was fostered or supported by another parent of the child (i.e. [Chavaree]) and the person (i.e. [Welch]) and the other parent (i.e.[Chavaree]) have understood, acknowledged, or accepted that or behaved as though the person is a parent of the child.

After amending its judgment to reflect these additional findings, the court denied Welch's motion for reconsideration, stating that she "has not made a prima facie showing of standing." Further, the court determined that it "does not need to hold a hearing on standing in this case" because "this is a hearing that need only be held, in the sole discretion of the court, if the court needs to determine disputed facts that are necessary to decide standing."

[¶8] Welch filed a timely appeal. *See* 19-A M.R.S. § 104 (2025); 14 M.R.S. § 1901(1) (2025); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶9] Welch maintains that her pleadings did set out sufficient facts to meet the threshold standing requirements in 19-A M.R.S. § 1891 and that the court erred by determining otherwise. Alternatively, she contends that the court abused its discretion by denying her request for a hearing because, contrary to the court's determination, there were disputed facts material to the issue of standing. We agree that on the record presented to the trial court in

this case, there are disputed facts material to the issue of standing and therefore a hearing should have been held to determine standing.

[¶10]  The Maine Parentage Act requires a party claiming status as a de facto parent to meet a threshold standing requirement by setting forth in an affidavit "specific facts to support the existence of a de facto parent relationship as defined in subsection 3."[3]  19-A M.R.S. § 1891(2)(A).  If there are "disputed facts that are necessary and material to the issue of standing," the court "may in its sole discretion" hold an expedited hearing to determine the facts.  *Id* § 1891(2)(C)*.*  We have held, however, that "[w]hen the trial court dismisses a de facto parentage petition for lack of standing without holding an evidentiary

---

[3]  Subsection 3 defines a de facto parent as one who "has fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in a child's life," which is demonstrated by a showing that

> **A.** The person has resided with the child for a significant period of time;
>
> **B.** The person has engaged in consistent caretaking of the child;
>
> **C.** A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child;
>
> **D.** The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and
>
> **E.** The continuing relationship between the person and the child is in the best interest of the child.

19-M.R.S. § 1891(3).

hearing, we review the court's decision not to hold a hearing for an abuse of discretion." *Libby v. Estabrook*, 2020 ME 71, ¶ 15, 234 A.3d 197; *see also Young v. King*, 2019 ME 78, ¶ 12, 208 A.3d 762.

[¶11] A court "acts within its discretion by declining to hold a hearing on standing when the assertions in the petitioner's affidavits, even if accepted as true, could not support a conclusion that the petitioner has standing." *Young*, 2019 ME 78, ¶ 11, 208 A.3d 762; *cf. Libby*, 2020 ME 71, ¶¶ 15-16, 234 A.3d 197. However, "where the standing determination will rest on the resolution of material facts that the parties have disputed in their affidavits, a hearing will be necessary to allow the court to . . . evaluate evidence in order to adjudicate those contested facts." *Young*, 2019 ME 78, ¶ 11, 208 A.3d 762. Even though the statute provides that a trial court has "sole discretion" to determine whether a hearing is necessary, we have held that a court abuses that discretion if it declines to conduct a hearing when there are conflicting facts in the parties' affidavits that create "bona fide issues of material fact." *Id.* ¶ 12; *see also Libby*, 2020 ME 71, ¶ 15, 234 A.3d 197.

[¶12] Here, the court determined that "no hearing is necessary because [Welch] has not shown, or provided the court, with prima facie evidence of all

of the factors in subsection 3."[4] Specifically, the court said that Welch's affidavit has not shown that "[her] relationship [with the child] . . . was fostered and supported by [Chavaree]" and that both parties "understood, acknowledged, or accepted that or behaved as though [Welch] is a parent of the child." Welch's affidavit viewed in isolation, however, does assert facts that "could have led to a finding" that Chavaree supported Welch's relationship with the child or behaved as though Welch was acting in a parental role. Because there were disputed facts, the court should have held a hearing to resolve the dispute. *See Libby*, 2020 ME 71, ¶ 15, 234 A.3d 197 ("The court abuses its discretion in declining to hold a hearing if (1) the facts in the petitioner's affidavit could have led to a finding that the petitioner has standing and (2) there are material facts that the parties have disputed in their affidavits." (alterations and quotation marks omitted)).

[¶13] Contrary to both the court's view and the dissent's view that Welch's affidavit "falls short" because it contains only "generalized and

---

[4] Because Welch moved for further findings of fact pursuant to M.R. Civ. P. 52(b), the scope of our review is limited in that "we cannot infer findings from the evidence in the record" and are confined to those found expressly by the trial court. *Douglas v. Douglas,* 2012 ME 67, ¶ 27, 43 A.3d 965; *see Sulikowski v. Sulikowski,* 2019 ME 143, ¶ 11, 216 A.3d 893; *Ehret v. Ehret,* 2016 ME 43, ¶ 9, 135 A.3d 101. Thus, even though the court stated that there was a failure of proof as to "the entirety of subsection 3(C)," it made specific findings only with respect to subsection 3(C)'s second and third components, which address the parties' understanding or acceptance of the nature of the putative de facto parent's relationship with the child, and not the first component, which addresses the nature of the relationship between the child and the putative de facto parent. Moreover, neither the April 8 order nor the May 17 order make specific findings as to the other elements in 19-A M.R.S. § 1891(3).

conclusory statements," *see* Dissenting Opinion ¶ 39, her affidavit *does* assert

specific facts that bear directly on the nature of her relationship with the child

as well as Chavaree's acceptance of that relationship. The affidavit avers that

Welch and Chavaree were in a relationship as partners for over three years;

Welch was involved with the child from birth; Welch lived with Chavaree and

the child from May 2018 to February 2021—for two years and eight months;[5]

and Welch and Chavaree established a "consistent home environment" for the

child during that time. Further, Welch's affidavit asserts that it "was intended"

by both parties that Welch "play a parental role in [the child's] life"; Welch, in

fact, did "engage[ ] in consistent caretaking of the child"; and Welch was "highly

involved in all aspects of the child's life"; supported the child financially,

provided the child "with all normal living essentials," and was listed as a parent

---

[5] The dissent maintains that "[j]ust how long Welch may have actually functioned in any kind parental role is in doubt because Welch did not provide detailed information in her affidavit." Dissenting Opinion ¶ 37. Quite the opposite is true: Welch's affidavit is clear in this regard. As noted in the text, her affidavit states, among other things, that she was present at the child's birth, moved in and formed a household with Chavaree and the child very shortly after the birth, played "an active role" and was "highly involved" in the child's life over the course of the next thirty-two months they lived together, and then maintained a relationship (with Chavaree's consent) after their separation. The dissent also suggests that "the limited duration of Welch's association with the child," Dissenting Opinion ¶ 39, was insufficient to support a claim of de facto parentage. *See* Dissenting Opinion ¶¶ 39-40. We disagree. Had Welch and Chavaree begun living together just before the child's birth rather than a few weeks after, Welch may have been entitled to claim parentage on an entirely separate ground under the Maine Parentage Act—the nonmarital presumption of parentage set out in 19-A M.R.S. § 1881(3) (2025) ("A person is presumed to be a parent of a child if the person resided in the same household with the child and openly held out the child as that person's own from the time the child was born or adopted and for a period of at least 2 years thereafter and assumed personal, financial or custodial responsibilities for the child."). The two-year benchmark is one adopted by the American Law Institute as a minimum period of cohabitation to support a parentage claim. *See* American Law Institute, *Principles of the Law of Family Dissolution* § 2.03(1)(c) (2002).

at the child's school. Moreover, Welch represents that following the parties' separation she "continued to co-parent [the child]" with Chavaree's support, including weekly dinners and overnight visits.[6]

[¶14] Chavaree's affidavit unequivocally disputes the assertion that Welch had an "intended parental role," stating that "there was never a conversation about what role [Welch] would play in [the child's] life" or about "seeking to adopt [the child], or gain[ing] any legal rights." Chavaree acknowledges that Welch was her partner but insists "there was no intention of a full-time parental role."

[¶15] Beyond the general denials about what the parties intended, however, Chavaree's affidavit is sparse when it addresses the specific assertions about the actual role Welch played in the child's life during the time

---

[6] Collectively, the assertions in Welch's affidavit, even though disputed, simply contradict the dissent's view that Welch's relationship with the child "was that of any live-in partner who helps with childcare and contributes to the household" and "more closely resembles the relationship between a child and [a] 'loving and helpful grandparent[]' who assisted with various childcare responsibilities for a time but were not 'invited to be treated as parents' by the child's parent[]." Dissenting Opinion ¶ 40. Moreover, the dissent's "notice" to parents to be wary of accepting "routine help with childcare," Dissenting Opinion ¶ 41, misjudges the import of this decision. In the end, Welch may well be unable to demonstrate standing, let alone prevail on the merits should the matter proceed to that stage. After all, we have recognized that "[t]he burden to show de facto parentage is steep." *Braithwaite-Baril v. McIntosh*, 2025 ME 48, ¶ 4, --- A.3d ---. However, it is important not to conflate a determination of standing with that of the merits, and our jurisprudence is clear that where affidavits present facts that "'could [lead] to a finding that the petitioner has standing'" and "there are 'material facts that the parties have disputed in their affidavits,'" a hearing is warranted to determine the facts, particularly where an assessment of credibility may be essential to that determination. *Libby v. Estabrook,* 2020 ME 71, ¶ 15, 234 A.3d 197 (alterations omitted) (quoting *Young v. King*, 2019 ME 78, ¶ 11, 208 A.2d 762).

they lived together. Chavaree directly disputes only four assertions, stating that Welch did not provide "[n]ormal living essentials," was not the "primary financial provider," was not responsible for arranging childcare and paid only a portion of those expenses, and did not pay for the extracurricular activity claimed. The remaining portions of Chavaree's affidavit either reiterate assertions about her general intentions or address the post-separation circumstances of the parties.

[¶16] Clearly, the parties' respective intentions about the role Welch would play in the child's life are pivotal in determining whether Chavaree "fostered or supported" the relationship between Welch and the child and whether Chavaree "understood, acknowledged or accepted" that relationship. Based on the pleadings alone, however, facts and assertions material to this element are squarely in dispute. Equally important, the actions or inactions of the parties—and the significance of those actions and inactions—are highly germane to the question of whether Chavaree "behaved as though the person [claiming de facto parent status] is a parent of the child." Facts bearing on this element are also in dispute.

[¶17] We agree with the dissent that "a parent who encourages someone"—even a romantic partner—"to develop a relationship with the parent's child is not necessarily accepting and acknowledging the other person

as a parent." Dissenting Opinion, ¶ 39. But here, on this record, there are "bona fide issues of material fact" regarding Welch's intended and actual role with respect to the child, and specifically with respect to whether Chavaree "fostered or supported" the relationship between Welch and the child and "understood, acknowledged or accepted that *or* behaved as though [Welch was] a parent of the child." 19-A M.R.S. § 1891(3)(C) (emphasis added). It was these components of subsection 3(C) as to which the court made findings and on which the court relied in denying standing. *See id.*

[¶18] Ultimately, the determination of whether Welch satisfied these key elements may well hinge upon the court's assessment of the credibility of the parties. That is an assessment better made after a hearing at which the parties testify rather than on the papers alone.[7] *See Libby*, 2020 ME 71, ¶¶ 11 n.1, 18, 234 A.3d 197 (recognizing that "the affidavits in a de facto parentage proceeding are not necessarily a substitute for a hearing" in a case in which the facts presented are "sharply dispute[d]"); *Weidul v. State*, 2024 ME 51, ¶ 33, 319 A.3d 1048 ("The direct observation of live testimony can be integral to a fact finder's function in assessing the credibility of disputed evidence."); *see also*

---

[7] A trial court has wide latitude to determine the scope of such a hearing. Depending upon the circumstances presented, a hearing could be limited to testimony from the parties only or even just cross-examination based on the parties' affidavits. The court also has discretion to "convene a single consolidated hearing addressing both standing and de facto parenthood." *Young*, 2019 ME 78, ¶ 13 n.4, 208 A.3d 762.

*Young*, 2019 ME 78, ¶¶ 11-13, 208 A.3d 762 ("Requiring a preliminary hearing on the issue of standing where . . . material facts are contested appropriately balances our recognition that parental rights disputes can be heavily factbound and that 'the facts are often infused with nuances and coated with emotional overlay' with our concerns for infringement on the fundamental right to parent." (citation and alteration omitted) (quoting *Kinter v. Nichols*, 1999 ME 11, ¶ 7, 722 A.2d 1274)).

[¶19]  We thus conclude that in the particular circumstances presented here—where (i) the parties' affidavits generate disputed facts material to the determination of an element of standing, (ii) resolution of the disputed facts turns upon the court's assessment of the credibility of one or both of the parties, and (iii) a party has expressly requested a hearing on the issue—the denial of a hearing constituted an abuse of discretion.

The entry is:

> Judgment vacated.  Remanded for proceedings
> consistent with this opinion.

———————————————

HORTON, J., dissenting.

[¶20] Because I agree with the trial court that the facts asserted by Katrina Welch in her affidavit are insufficient to establish the elements of de facto parenthood by a preponderance of the evidence, I respectfully dissent.

[¶21] Only in limited circumstances may a court constitutionally establish parental rights in a person other than a child's parents. Our jurisprudence on parental rights makes clear that merely helping a parent care for a child while living with the child's parent does not make the helper a de facto parent. I will summarize the law and then apply it to the affidavit submitted in this case.

[¶22] "Despite . . . shifts in family and social structure, it remains firmly established that parents have a fundamental liberty interest to direct the care, custody, and control of their children," including "the right to decide who may associate with the child." *Pitts v. Moore*, 2014 ME 59, ¶ 11, 90 A.3d 1169 (quotation marks omitted). "To preserve that right, and in recognition of the presumption that parents act in their children's best interests, unless a person is determined to be an unfit parent, there is normally . . . no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* (quotation marks omitted).

[¶23]  "When the State does interfere with the fundamental right to parent, [the Court] must evaluate that interference with strict scrutiny—the highest level of scrutiny—which requires that the State's action be narrowly tailored to serve a compelling state interest."  *Id.* ¶ 12 (quotation marks omitted).  Applying that standard, the Court has "limited the State's intrusions into the parent-child relationship to those instances in which there is some urgent reason or there are exceptional circumstances affecting the child that justify the intrusion." *Id.* (footnote omitted).

[¶24]  To protect the interest of a child, an intrusion on parental rights may be authorized to protect a child from abuse or neglect, *see* 22 M.R.S. § 4036(1) (2025); to establish de facto parentage under the Maine Parentage Act, *see* 19-A M.R.S. §§ 1843(1), 1851(5), 1891 (2025); to allow reasonable visitation or access to a grandparent, *see* 19-A M.R.S. §§ 1801-1806 (2025); to "award reasonable rights of contact with a minor child to a 3rd person" in a parental rights and responsibilities proceeding, *see* 19-A M.R.S. § 1653(2)(B) (2025); or to establish a guardianship of the child under the Probate Code, *see* 18-C M.R.S. § 5-204 (2025). *See Pitts*, 2014 ME 59, ¶ 13 & n.5, 90 A.3d 1169.

[¶25]  Before the enactment of the Maine Parentage Act, the Court held that "loving and helpful grandparents" who assisted during a difficult time but were not "invited to be treated as parents" by the child's parents were not

transformed into de facto parents. *Philbrook v. Theriault*, 2008 ME 152, ¶ 26, 957 A.2d 74 (quotation marks omitted). To "award . . . the full panoply of parental rights and responsibilities to a non-parent," the Court has "required a showing of harm to the child in the absence of such government interference." *Pitts*, 2014 ME 59, ¶ 16, 90 A.3d 1169. The harm that an award of de facto parentage seeks to avoid is the disruption of a child's attachment to a de facto parent when that disruption results in the child's life being "substantially and negatively affected." *See id.* ¶ 29.

[¶26] Thus, in the years leading up to the adoption of the Maine Parentage Act, the Court "never extended the de facto parent concept to include an individual who ha[d] not been understood to be the child's parent but who intermittently assume[d] parental duties at certain points of time in a child's life. Rather, when [the Court] ha[d] recognized a person as a de facto parent, [the Court] ha[d] done so in circumstances when the individual was understood and acknowledged to be the child's parent both by the child and by the child's other parent." *Philbrook*, 2008 ME 152, ¶ 23, 957 A.2d 74.

[¶27] For example, the Court concluded that a person was a de facto parent when he believed that he was the biological parent of a child and fulfilled that parental role for several years before paternity testing revealed that he was not the biological father. *Stitham v. Henderson,* 2001 ME 52, ¶¶ 2-3, 17, 768

A.2d 598. The Court also treated a person as a de facto parent when both parties agreed that the person was a de facto parent because she was the partner of the child's biological mother for years, beginning before the mother was artificially inseminated, and undertook a complete parental role with the consent of the mother, including through parenting agreements executed in writing before conception and after the parties' separation. *C.E.W. v. D.E.W.*, 2004 ME 43, ¶¶ 2-4, 11, 13, 845 A.2d 1146.

[¶28] The Legislature then enacted the Maine Parentage Act, P.L. 2015, ch. 296, §§ A-1, D-1 (effective July 1, 2016) (codified as subsequently amended at 19-A M.R.S. §§ 1831-1939 (2025)), which defines the circumstances in which a court may determine that a person is a de facto parent, *see* 19-A M.R.S. § 1891. Because of constitutional constraints, the Court interpreted the Act's requirement of prima facie evidence to establish standing to mean that the party seeking standing to assert de facto parentage must make an initial showing of those elements by a preponderance of the evidence. *See id.* § 1891(2)(C); *Davis v. McGuire*, 2018 ME 72, ¶¶ 13-26, 186 A.3d 837. "Holding a party seeking de facto parenthood status to the burden of persuasion . . . best achieves the desired balance between the parents' fundamental rights [and] the legitimate interests of third parties . . . asserting their status as de facto parents." *Davis*, 2018 ME 72, ¶ 23, 186 A.3d 837 (quotation marks omitted); *see also*

*Lamkin v. Lamkin*, 2018 ME 76, ¶ 12, 186 A.3d 1276 (holding that that a person must demonstrate standing to pursue an action that intrudes on parental rights as "a safeguard designed to prevent unjustified interference with the fundamental rights inherent in a parent-child relationship, while also allowing an adjudication of any legitimate interests of third parties that would affect that relationship").

[¶29]   Even to justify a lesser intrusion on constitutional parental rights—grandparent visitation and access—a grandparent must demonstrate either "a sufficient existing relationship between the grandparent and the child" or "[a]ny other compelling state interest [that] justifies the court's interference with the parent's fundamental right to deny the grandparent access to the child."  19-A M.R.S. § 1803(1)(B), (D).  The Court held that in determining whether a relationship is sufficient under this statute, a court can apply the statute constitutionally "only when the most *urgent reasons* are present as the compelling state interest that is constitutionally required to justify governmental interference with the natural right of a parent to the care and control of a child."  *Lamkin*, 2018 ME 76, ¶ 14, 186 A.3d 1276 (quotation marks omitted).

[¶30]  An "urgent reason" exists when, for instance, "a grandparent who has functioned as a parent to the child seeks continued contact with that child—

in other words, [w]hen a grandparent has been the primary caregiver and custodian for a child over a significant period of time." *Id.* ¶ 15 (quotation marks omitted); *see also Robichaud v. Pariseau*, 2003 ME 54, ¶ 10, 820 A.2d 1212 (stating that "extraordinary contact between a grandparent and grandchildren" is necessary "to satisfy the constitutional requirement of a compelling state interest to interfere with parents' right to care for and control their children"). Intermittent contact that is not extraordinary is inadequate to confer standing. *See id.* And "despite the benefits to a child that could accompany a healthy and loving relationship with the child's grandparents, it will be difficult for a grandparent to demonstrate a compelling state interest sufficient to infringe on a fit parent's fundamental right when there is no threat of harm to the child." *Dorr v. Woodard*, 2016 ME 79, ¶ 16, 140 A.3d 467.

[¶31] After the adoption of the Maine Parentage Act, which is at issue here, when disputes of *material* fact arise in determining whether a person has standing to bring a claim, a preliminary hearing is necessary to "appropriately balance[] our recognition that parental rights disputes can be heavily factbound and that [t]he facts are often infused with nuances and coated with an emotional overlay, with our concern for infringement on the fundamental right to parent." *Young v. King*, 2019 ME 78, ¶ 13, 208 A.3d 762 (citations and quotation marks omitted); *see also Libby v. Estabrook*, 2020 ME 71, ¶ 15, 234

A.3d 197 ("The court abuses its discretion in declining to hold a hearing if (1) the facts in the petitioner's affidavit could have led to a finding that the petitioner has standing and (2) there are material facts that the parties have disputed in their affidavits." (alterations and quotation marks omitted)).

[¶32] To succeed in establishing standing under the Act, the person seeking to be declared a de facto parent must provide specific information in the affidavit showing that it is more likely than not that the petition satisfies each element of de facto parentage. *See Libby*, 2020 ME 71, ¶ 20, 234 A.3d 197; *Davis*, 2018 ME 72, ¶ 23, 186 A.3d 837. It is clear that the trial court applied the correct preponderance standard in ruling that Welch lacked standing.

[¶33] At issue here is the element that the trial court found was lacking in Welch's affidavit: "A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child." 19-A M.R.S. § 1891(3)(C). For purposes of determining Welch's standing, the question is whether the facts in her affidavit demonstrate that it is more likely than not that she is a de facto parent, bearing in mind that if she establishes standing, the higher clear-and-convincing

standard governs the outcome. *See Davis*, 2018 ME 72, ¶ 26, 186 A.3d 837; 19-A M.R.S. § 1891(3).

[¶34] In considering this element, the Court recently held that an affidavit generated an issue of fact for hearing because the petitioner averred in his affidavit that "he and the mother essentially coparented the child for a majority of the child's life," while the child's father's "involvement with the child was sporadic and inconsistent for most of this time." *Libby*, 2020 ME 71, ¶ 16, 234 A.3d 197 (quotation marks omitted). The Court reasoned that those facts could demonstrate that the mother understood the petitioner to be a parent "and behaved as though [the petitioner] occupied the parental vacuum" occasioned by the father's "lack of engagement with the child for a significant period of the child's life." *Id.* There, the petitioner also stated in his affidavit that the child understood the petitioner's family to be his own family and that the petitioner, the mother, and the child participated in family events with the petitioner's family and National Guard unit. *Id.* ¶ 17.

[¶35] The Court noted that its "decision in this case [was] a narrow one" and emphasized that its decision was "based on the specific facts contained in the parties' affidavits." *Id.* ¶ 20. The Court elaborated that it did not intend to hold that "any stepparent has standing to petition for de facto parentage based solely on the time spent with a child in the ordinary course of that person's

marriage to the child's legal parent. Rather, a stepparent—like any other petitioner—has the burden to prove all the elements of standing, including that a legal parent of the child intended for the stepparent to assume a parental role, *see* 19-A M.R.S. § 1891(3)(C)." *Libby*, 2020 ME 71, ¶ 20, 234 A.3d 197.

[¶36] As the Court has made clear before, not every stepparent or partner of a child's parent who cares for the child with a legal parent during part of the child's life becomes, by virtue of the resulting relationship, a de facto parent to the child. *See id.* To justify a hearing on standing, a person's affidavit must assert more than the temporary supportive role of a partner to a child's parent because intrusions on parents' fundamental rights are allowed only in the rare circumstances in which the state may intercede to prevent harm to a child. *See id.*; *Philbrook*, 2008 ME 152, ¶ 26, 957 A.2d 74; *Pitts*, 2014 ME 59, ¶¶ 16, 29, 90 A.3d 1169.

[¶37] Even if Welch proved all of the facts set forth in her affidavit, she would not have standing. Welch's affidavit does not assert that she acted as a parent from the day that she and Chavaree began living together, nor does it assert any specific facts to demonstrate that she continued to act as a parent after her relationship with Chavaree ended. Just how long Welch may have actually functioned in any kind of parental role is in doubt because Welch did not provide detailed information in her affidavit.

[¶38]  Our previous decisions recognizing standing to pursue de facto parenthood generally involved claimants who lived with the children for longer periods.  *See, e.g., Leonard v. Boardman*, 2004 ME 108, ¶¶ 11, 16, 854 A.2d 869 (reporting a trial court's finding of de facto parentage after eight years of residing with the child); *Stitham*, 2001 ME 52, ¶¶ 2, 17, 768 A.2d 598 (discussing a person's status as a de facto parent when the person had resided with the child for three years); *C.E.W.*, 2004 ME 43, ¶¶ 1-3, 845 A.2d 1146 (acknowledging the parties' agreement that a person was a de facto parent after five years of residing with the child); *Young v. Young*, 2004 ME 44, ¶¶ 1-2, 845 A.2d 1144 (remanding for consideration of de facto parenthood when a person had resided with the child for five years); *Libby*, 2020 ME 71, ¶¶ 4-7, 234 A.3d 197 (remanding for a hearing on standing when a person had resided with the child for seven years, interrupted only by the person's two-year military deployment); *King*, 2019 ME 78, ¶¶ 1, 4, 208 A.3d 762 (remanding for a hearing on the merits when a person had resided with the child for nearly three years); *Eaton v. Paradis*, 2014 ME 61, ¶¶ 1-5, 91 A.3d 590 (remanding for reconsideration of de facto parentage when a person had resided with the children for at least four years); *cf. Philbrook*, 2008 ME 152, ¶¶ 1-5, 12, 957 A.2d

74 (affirming a finding that grandparents were not de facto parents despite having the child in their home intermittently over the course of nine years).[8]

[¶39]  Apart from the limited duration of Welch's association with the child, Welch's affidavit falls short in what it conveys about the nature of Welch's relationship with the child when they shared a home.  The affidavit asserts generalized and conclusory statements about Welch's relationship with the child but does not show that it is more likely than not that a parental relationship "was fostered or supported" by the child's mother and that Chavaree "understood, acknowledged or accepted that or behaved as though" Welch was a parent of the child.  19-A M.R.S. § 1891(3)(C).  The affidavit's assertions made in the passive voice that "[i]t was intended that [Welch] would play a parental role in [the child]'s life" and that Welch is "listed on [the child's] school paperwork as a parent" do not indicate that *Chavaree* intended to have Welch act as a parent or that *Chavaree* told the school that Welch was a parent.  Welch's presence at the birth and assistance in childcare during her

---

[8] The Court has not remanded for *a hearing on standing* when a person has asserted cohabitation with a child for a shorter duration.  When the Court remanded in *Gordius v. Kelley*, it did so without regard to the child's two-year period of cohabitation with the person seeking de facto parentage, ruling that remand was necessary because the trial court had misunderstood the law in ruling on de facto parentage after an evidentiary hearing.  2016 ME 77, ¶¶ 3-4, 6, 15-16, 139 A.3d 928.  In *Pitts v. Moore*, the Court remanded for reconsideration under a new test after the trial court had held an evidentiary hearing and established de facto parent status in a person who had resided with the child for nineteen months.  2014 ME 59, ¶¶ 2-4, 40-41, 90 A.3d 1169.  In both cases, an evidentiary hearing had already been held, and the Court was not deciding whether a hearing on standing was required.

relationship with Chavaree does not, without more, establish Chavaree's understanding, acknowledgment, or acceptance of Welch in a permanent parental role. *Cf. Libby*, 2020 ME 71, ¶¶ 16-17, 20, 234 A.3d 197 (requiring a hearing on standing when the affidavit conveyed specific facts showing that the petitioner filled a parental role left vacant by the child's father for most of the child's life, with the acknowledgment of both parents). Neither Chavaree's allowance of weekly overnight and dinner visits after the parties' separation nor Welch's generalized and conclusory claim to have served as a "co-parent" with some involvement in day-to-day decision making regarding the child makes it more likely than not that the child's mother understood, acknowledged, or accepted Welch in a parental role. Anyone who provides childcare makes decisions about the child while doing so; that does not mean that the child's parent understood, acknowledged, or accepted the childcare provider as another parent. And that is the essential flaw in Welch's affidavit and the Court's decision in the case—a parent who encourages someone to develop a relationship with the parent's child is not necessarily accepting and acknowledging the other person as a parent of the child.

[¶40] The relationship Welch claims to have had with the child was that of any live-in partner who helps with childcare and contributes to the household. It is different in kind and duration from the relationships that

would be sufficient to warrant a trial on standing or on de facto parenthood, as where the person for years believed he was the biological parent of a child and took on a full parental role, *see Stitham,* 2001 ME 52, ¶¶ 2-3, 17, 768 A.2d 598; the person undertook a complete parental role with the consent of the mother after a planned artificial insemination, and the person and the mother executed a parenting agreement in writing after their separation, *see C.E.W.,* 2004 ME 43, ¶¶ 2-4, 11, 13, 845 A.2d 1146; or the mother's partner, with the acknowledgment of the biological parents, "occupied the parental vacuum" left by an unengaged father, *see Libby*, 2020 ME 71, ¶ 16, 234 A.3d 197. Rather, the relationship at issue here more closely resembles the relationship between a child and "loving and helpful grandparents" who assisted with various childcare responsibilities for a time but were not "invited to be treated as parents" by the child's parents. *See Philbrook*, 2008 ME 152, ¶ 26, 957 A.2d 74 (quotation marks omitted). The child primarily referred to Welch as "Gaga," not a typical sobriquet for a parent. Although Welch's affidavit demonstrates that Chavaree agreed for Welch to assist and develop her own relationship with the child, Welch does not assert specific facts that, even if proved by a preponderance of the evidence at a hearing, could establish her standing to litigate whether Chavaree intended, understood, acknowledged, or accepted Welch as a permanent *parent* to the child.

[¶41] By diminishing the threshold for standing, the Court's decision today diminishes the constitutional protection our precedent has extended to parents. It blurs the distinction between a parent and a romantic partner who provides child-related help when residing with the child's parent. Chavaree now must undergo at least one trial, possibly two, because she allowed (and perhaps even encouraged) Welch to assist with childcare while they lived together. The Court's decision today should put parents on notice that if they accept routine help with childcare from partners, relatives, or others with whom they reside—be it babysitting, pick-ups and drop-offs, or occasional overnights after separation—they may unwittingly be inviting claims of de facto parent status for the rest of the child's life, even if these others have never done more than help the parent with childcare. Parents should be able to accept help from their loved ones in caring for a child without being ensnarled in litigation over parental rights. *Cf. Libby*, 2020 ME 71, ¶¶ 16-17, 20, 234 A.3d 197; *Stitham,* 2001 ME 52, ¶¶ 2-3, 17, 768 A.2d 598; *C.E.W.,* 2004 ME 43, ¶¶ 2-4, 13, 845 A.2d 1146.

Taylor Courtois, Esq., and Brittany Sawyer, Esq. (orally), Holmes Legal Group, LLC, Wells, for appellant Katrina Welch

Gregory J. Orso, Esq. (orally), Orso Law, P.A., York, for appellee Naomi Chavaree

Biddeford District Court docket number FM-2024-238
FOR CLERK REFERENCE ONLY